UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DYNAMIC INTERNATIONAL ) | Case No. 17-10814 |
| AIRWAYS, LLC ) | Chapter 11 |
| ) | |
|     Debtor. ) | |
| _____ ) | |

**OMNIBUS DECLARATION OF PAUL KRAUS IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION, FIRST DAY MOTIONS, AND EMPLOYMENT APPLICATION**

I, Paul Kraus, hereby declare as follows:

1. I am over the age of 18 and am mentally competent and I make this declaration in support of Debtor's Chapter[1] 11 Petition and the following Motions and Applications:

   a. *Emergency Motion Seeking Interim and Final Orders: (1) Authorizing Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Superpriority Administrative Expense, and (3) Setting and Prescribing the Form and Manner of Notice for a Final Hearing* (the "DIP Financing Motion");

   b. *Emergency Motion for Order: (I) Authorizing Debtor to Pay Wages, Salaries, Benefits, Reimbursable Expenses and Other Employee Obligations; and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "Employee Wage Motion");

   c. *Emergency Motion for Order Authorizing Maintenance of Prepetition Cash Management System and Maintenance of Pre-Petition Bank Accounts* (the "Cash Management Motion");

   d. *Motion for Order (I) Authorizing the Debtor to Pay and Honor Prepetition Obligations to Customers and (II) Authorizing and*

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "LBR" shall refer to the Local Rules of Practice of the United States Bankruptcy Court, Middle District of North Carolina.

>    *Directing the Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "Customer Deposit Motion");
>
> e.  *Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "Utility Motion")
>
> f.  *Application by Debtor-in-Possession to Employ Attorneys* (the "Employment Application" and, together with the DIP Financing Motion, the Employee Wage Motion, the Cash Management Motion, the Customer Deposit, and the Utility Motion, the "First Day Motions").[2]

2. Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on July 19, 2017 (the "Petition Date").

3. I am the managing member and chief executive officer ("CEO") of Dynamic International Airways, LLC ("Debtor"). In my capacity as Debtor's manager and CEO, I am familiar with Debtor's daily business, operations, and financial affairs. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

A. **Debtor's Operations**

  a. **Debtor's Current Operations.**

4. Debtor is a Virginia limited liability company formed in 2010 that operates in High Point, North Carolina. Debtor is owned by members Commercial Aircraft Services Holdings, LLC, NVLV Management LLC, and the F. Paul Ohadi Trust dtd 12/15/99.

5. Debtor's ultimate principals are myself, through my ownership of Commercial Aircraft Services Holdings, LLC, and Kenneth M. Woolley, through his ownership of NVLV Management, LLC. We acquired the business in 2013.

6. Debtor owns and operates a full-service aviation enterprise, and is a licensed and certificated air carrier authorized by the U.S. Department of Transportation (the "DOT") and the U.S. Federal Aviation Administration (the "FAA"). Debtor holds a Part 121 Certificate (large aircraft) and operates as a supplemental air carrier, providing charter and contract commercial passenger air travel services to the general public.

---

[2] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

7. Debtor's fleet of aircraft includes the following six Boeing 767s (the "Leased Aircraft"), which complete international flights between United States cities and territories and foreign countries:

    a. A Boeing 767-23B bearing serial number 23974 and U.S. Registration Mark N253MY leased from KMW Leasing IV, LLC;

    b. A Boeing 767-246 bearing serial number 23213 and U.S. Registration Mark N767DA leased from KMW Leasing IX, LLC;

    c. A Boeing 767-336 bearing serial number 24339 and U.S. Registration Mark N796MY leased from KMW Leasing N796JM, LLC;

    d. A Boeing 767-336 bearing serial number 25443 and U.S. Registration Mark N254MY leased from KMW Leasing VII, LLC;

    e. A Boeing 767-336 bearing serial number 24343 and U.S. Registration Mark N740JM leased from KMW Leasing X, LLC

    f. A Boeing 767-300ER bearing serial number 24342 and U.S. Registration Mark N793JM leased from KMW Leasing X, LLC

(KMW Leasing IV, LLC, KMW Leasing IX, LLC, KMW LeasingN796JM, LLC, KMW Leasing VII, LLC, and KMW Leading X are collectively referred to as the "KMW Entities").

8. Currently, Debtor's operations include the following major scheduled charter flights between the following airports:

    a. John F. Kennedy International Airport in New York and Cheddi Jagan International Airport in Guyana year-round, five days a week;

    b. John F. Kennedy International Airport in New York and Jose Joaquin de Olmedo International Airport in Ecuador year-round, between two and seven days a week depending on seasonal need;

    c. Ontario International Airport in California and Nanchang Changbei International Airport in Nanchang, China (through Ted Stevens Anchorage International Airport in Alaska) seasonally four days a week;

    d. Nanjing Lukou International Airport in Nanjing, China and Saipan International Airport in the Northern Mariana Islands several days a week during July and August;

    e. Nanchang Changbei International Airport in China and Saipan International Airport in the Northern Mariana Islands several days a week during July and August; and

  f. Changchun Longjia International Airport in Jilin Province and Saipan International Airport in the Northern Mariana Islands several days during July and August; and

  g. ACMI/Wet Lease[3] operations and ad-hoc charter as required by customers services

(the "Scheduled Charter Services").

9. Under its supplemental certificate, Debtor also provides other contract and charter flights and services on an as-needed and as-commissioned basis (the "Additional Charter Operations," and together with the Scheduled Charter Operations, the "Charter Operations").

### b. Debtor's History and Vision.

10. There is an outstanding marketplace that is mainly unserved by United States airlines called secondary cities. As an example, Nanjing, China has a population of 8.2 million people, Ningbo, China has a population of 7.6 million people, and Hangzhou, China has a population of 9.1 million people. In contrast, Los Angeles, California has a population of 4 million people. Chinese inbound tourism into the United States has had enormous growth over the past seven years. In 2010, 800,000 Chinese people visited the United States. In 2016, 3.01 million Chinese people visited and, by 2020, it is projected that the number of Chinese tourists will increase to 6 million. Furthermore, in 2016 Chinese tourists spent $29 billion dollars while traveling to the United States.

11. When Mr. Woolley and I acquired Debtor in 2013, our sole intention was to position Debtor to operate to and from China with scheduled operations, as opposed to the Charter Operations that Debtor had been operating and continues to operate. In short, airlines can transport passengers in two ways: (1) through common carriage, published schedules, with published fares as one would normally see with the typical larger existing airlines ("Scheduled Services") or (2) through the Charter Services. Obviously, the Scheduled Services provide greater flexibility and scale for operations and capturing the growth of Chinese travel to United States cities and territories.

12. Over the past four years, Debtor has uniquely positioned itself to capture the market for Scheduled Services.

13. First, in June 2013, Debtor filed its application for a China Civil Aviation Regulations Part-129 certificate ("CCAR-129"). The Civil Aviation Administration of China ("CAAC") approved the CCAR-129 on December 31, 2013. The approval marked Debtor's formal engagement to enter Charter Services between the China mainland and United States territories. Debtor launched its Charter Services from Tianjin and Hangzhou, China to Saipan as well as Beijing, Dalian, and Chengdu, China to Guam during the 2014 Chinese New Year holiday period. From May to July in 2014, Debtor

---

[3] ACMI/Wet Lease generally refers to a leasing arrangement whereby Debtor provides an aircraft, complete crew, maintenance, and insurance (ACMI) to another airline or broker, which paus by hours operated.

also provided Charter Services from Hong Kong to Saipan.

14. On June 21, 2014, Debtor and the Guam Visitors Bureau cooperated to launch Charter Services from Beijing and Guam. This cooperation ended a long history of no direct flights between China and Guam and was so celebrated that China Central Television ("CCTV") reported the inauguration news.

15. This historic route operated every six days for more than three months with twenty-two flights, and took over 2200 Chinese visitors to Guam.

16. On December 28, 2014, Debtor launched Charter Services on the Changsha (China)-Anchorage-Los Angeles route, which was the first commercial flight between the Hunan Province and the United States mainland.

17. Starting in September 2014, Debtor operated three bi-weekly Charter Services between Hong Kong and the Republic of Palau, which later increased to twice weekly. This route has lasted for fourteen months.

18. In 2015, Debtor continuously operated Charter Services from various Chinese cities to Guam, and opened summer Charter Services from Hong Kong to Saipan. From September to November in 2015, Debtor operated two months of incentive Charter Services from Shijiazhuang, China to Saipan and took over 2300 Chinese visitors to Saipan.

19. By 2016, Debtor not only had holiday Charter Services from several Chinese cities to Guam, but also had Charter Services from Tianjin, Shenyang, Jinan, Nanjing, Hangzhou and Shijiazhuang, China to Saipan.

20. In October and November 2016, Debtor launched the Nanchang (China)-Anchorage-Los Angeles route for the Jiangxi province, again ending a historical lack of direct flights between Jiangxi province and the United States mainland.

21. Most recently, during the 2017 Chinese New Year, Debtor operated Charter Services from Jinan, Wuxi, Hangzhou, Ningbo, Shijiazhuang, and Nanchang, China to Saipan and transported over 5000 Chinese visitors.

22. As of the Petition Date, Debtor holds fourteen Chinese cities on its CCAR-129, leaving two more cities in which Debtor can and will still expand. The following Chinese cities are approved for Debtor's flights: Beijing (PEK), Changsha (CSX), Chengdu (CTU), Dalian (DLC), Hangzhou (HGH), Jinan (TNA), Nanjing (NKG), Ningbo (NGB), Shenyang (SHE), Shijiazhuang (SJW), Tianjin (TSN), Zhengzhou (CGO), Nanchang (KHN), Wuxi (WUX)

23. Debtor is approved to fly to more Chinese cities than any other USA based carrier. This unique focus has positioned Debtor for serving markets with both Charter Services and Scheduled Services that no other United States carrier has provided and created a unique business model that, upon Debtor's reorganization under Chapter 11, will provide significant future income.

### c. **Debtor's Proposed Expansion to Scheduled Services**

24. While Debtor's services are currently limited to the Charter Operations as it is only authorized to perform supplemental operations, Debtor has submitted an application (the "Flag Application") to expand its operations to include a FAR 121 Flag Operation and become a Flag Carrier (the "Expansion Plan") to be able to fly Scheduled Services.

25. In short, a Flag Carrier is permitted to operate its own flights between any point in the U.S. or a territory thereof instead of being required to operate such flights through Charter Services. This system has the significant benefits of, among other things, increased revenue and direct sales to consumers with immediate access to client funds instead of having to be processed through Escrow Accounts (as defined below).

26. Furthermore, the CAAC's of strict regulations for Charter Services means expanding to provide Scheduled Services will result in significant benefit to Debtor.

   a. First, the CAAC limits Charter Services to operating any single city pair route no more than 90 days continuously and no more than 120 days in one year, which restriction is eliminated for Scheduled Services.

   b. Second, once Scheduled Services are established, no Charter Services are accepted for the same city pair thereby making Debtor the sole operator for those same city pairs.

   c. Third, currently Charter Services approval only could be issued monthly and no application can be accepted over one month making the administrative burden for constant and uncertain applications consuming.

   d. Fourth, Charter Services have the lowest priority for scheduling, meaning that Charter Services always receive the worst time slots. This also means that where no time slots remain at an airport, which is frequently the case for busy airports like Beijing, Charter Services cannot operate.

27. The Flag Application to allow Debtor to switch to Scheduled Services was submitted to the DOT and FAA over two years ago. Debtor has received preliminary approval of the Flag Application. However, as a result of some of the temporary operational challenges described herein, final application has been temporarily delayed, although Debtor anticipates achieving such final approval during the Chapter 11 Case.

28. Once the United States DOT finally approves the Flag Application, granting Debtor Flag Status (described in more detail herein), Debtor will be able to carry out the business plan contemplated since my and Mr. Woolley's acquisition of Debtor.

29. Specifically, most of Debtor's Charter Services routes in China are ready to

turn to Scheduled Services and the market has been well developed. Debtor is a well-known Charter carrier in China.

30. Debtor's General Service Agent ("GSA") in China is CITS which is the largest central government owned public tourism group company. CITS has over 4000 locations in the major cities all over China and its sales chain covers over-the-counter sales to the Chinese online travel agencies.

31. Debtor's China office is located inside the CITS building in the center of Beijing City. CITS has strong government relationship which can strongly support Debtor's doing business in China. The relationship has helped Debtor develop rapidly and earn good business reputations in the market.

32. As we have done so through its entire operations, Mr. Woolley and I remain committed to making Debtor a successful operation and honoring its initial goal of providing reliable and quality air travel for areas that are in need of additional options and specifically, to starting and growing Scheduled Services in Asia.

**B.    Debtor's Capital Structure.**

33. Debtor's debt, other than vendor payables and arbitration awards and judgments, is primary limited to loan obligations owed to myself and Mr. Woolley. The Debtor has no secured debt other that in favor of Mr. Woolley mentioned below.

34. As of the Petition Date, I have contributed more than $12 Million to Debtor through various capital contributions.

35. As of the Petition Date, Debtor had approximately $12.1 Million in obligations to Mr. Woolley for moneys loaned. Approximately $6,000,000 is secured by all of Debtor's personal property, including accounts receivable, perfected pursuant to a UCC-1 financing statement filed in Virginia in August 2016. The remaining balance is unsecured and reflected in the promissory notes executed between August and September 2016. These unsecured amounts are in addition to the nearly $35 Million that Mr. Woolley has contributed to Debtor through various capital contributions.

36. Mr. Woolley is also the manager and member of the KMW Entities which are collectively owned more than $10,500,000 in unpaid rent for the Leased Aircraft accruing since December 2015.

**C.    The Events Necessitating the Bankruptcy Filing.**

    **a.    Past Management Changes and Resulting Challenges.**

37. Debtor has consistently sought to retain high quality and experienced individuals to control the operations and finances of the Debtor. However, over the past several years, Debtor has encountered significant challenges in finding and retaining qualified employees.

38. For example, since 2013, Debtor has had three chief executive officers, four chief operating officers, and three chief financial officers. While such actions have not impacted the ultimate financial stability or safety of Debtor's operations, it has led to significant cash losses. These management changes also resulted in different accounting and operations tracking systems which has caused some confusion and some items to be overlooked and not properly handled.

39. Despite these losses and changes, Debtor's principals have remained committed to funding Debtor and pursuing the Expansion Plan so that operations can continue, employees can retain their jobs, and creditors can be paid.

40. Most recently debtor has retained MJAC L.L.C. d/b/a Allison Consulting ("MJAC"), A North Carolina Limited Liability Company. MJAC LLC provides financial and operations counseling to national and local businesses (specializing in turnarounds and performance improvement). It is currently engaged to assist the company in evaluating its long-term viability and to advise management as to short-term issues relating to cash flow, profitability, operations and finance.

41. MJAC's review has revealed a series of challenges that require Debtor to seek the protections afforded by the Bankruptcy Code to allow the Debtor a chance to take control of and reorganize its existing financings and operations.

42. These challenges include:

   a. Debtor is involved in a series of arbitrations and litigation related to its 2014 contract with Air India, Ltd. ("Air India") concerning a charter service for the 2014 Haj Pilgrimage to Mecca. While Debtor performed under the contract, full payment was not provided resulting in several disputes.

      i. Initially, Debtor filed a lawsuit in the United States District Court for the Southern District of New York against Air India. Over Debtor's objection, Debtor was forced to engage in arbitration in India, which resulted in an approximately $11 million arbitration award against Debtor. Debtor is in the process of appealing the arbitration award in India.

      ii. The lack of payment by Air India to Debtor resulted in arbitration demands being filed by three parties to whom Debtor was allegedly required to make payments: BKP Enterprise ("BKP"), Expim International ("Expim"), and Worldwide Charter Group ("Worldwide," and together with BKP and Expim, the "Arbitration Creditors").

      iii. BKP and Expim obtained a combined arbitration award in Canada in a combined approximate amount of $3.5 million (the "BKP and Expim Award"). While Debtor has filed a notice of appeal and intent to challenge the BKP and Expim Award, it

        was nonetheless confirmed and judgment entered by the United States District Court for the Middle District of North Carolina on May 31, 2017.

    iv. Worldwide obtained an arbitration award in Canada in the approximate amount of $900,000 (the "Worldwide Award"). Debtor is in the process of examining its rights and options as it related to the award in favor of Worldwide Award.

b. PMC Aviation 2012-1 LLC ("PMC") obtained a judgment against Debtor in the amount of $1,190,807.24 entered in the Circuit Court of Rockingham County in Virginia on or about June 26, 2017 (the "PMC Judgment"). Debtor is in the process of examining its rights and options as it related to this judgment. However, PMC has indicated an intent to commence aggressive collection efforts on the PMC Judgment and, on July 18, 2017, garnished certain of Debtor's bank accounts.

c. Pas Consulting Group, LLC ("Pas") obtained a judgment against Debtor in the amount of $151,743.50 entered in the United States District Court for the Southern District of Florida on or about May 25, 2017 (the "Pas Judgment"). Debtor is in the process of examining its rights and options as it related to this judgment. However, Pas has commenced collection efforts on the Pas Judgment

d. Debtor has other vendors that have, in the past, gone unpaid which has resulted in, among other things, garnishments against Debtor's bank accounts. Although Debtor has worked through these garnishments, Debtor needs additional time to review any other outstanding liabilities and determine a plan for repayment.

43. The management changes, along with the legal and accounting challenges Debtor has encountered, is the primary reason for the delay of final approval of the Flag Application. Specifically, Debtor is informed and believes that once these issues are resolved, which Debtor can achieve through its Chapter 11 Case and present management, the DOT and FAA are likely to grant final approval of the Flag Application and Debtor may commence its expanded operations.

### b. Debtor Is Required to Advance Funds Necessary to Complete Flights.

44. As Debtor's is currently limited to Charter Operations, federal regulations generally require that passenger payments for tickets be held in escrow until the passenger's flight has been completed.

45. Specifically, a passenger's funds are initially restricted funds held in an escrow account controlled by Shelby Financial Services (the "Escrow Accounts"). The Escrow Account functions as a restricted escrow account, in which all customer charter funds are deposited until the applicable charter flight is flown.

46. Upon completion of the flights, the escrowed funds, are deposited into the Debtor's operating account to satisfy the operating expenses associated with Debtor's business.

47. As a result, Debtor is required to essentially advance all funds necessary to operate the charter flights in the short term. This point is critical because the mounting pressure of outstanding pending awards and judgments puts Debtor at risk of interrupted operations absent the protections of this Court.

**D.    Debtor's Plan to Reorganize**

48. The combination of the factors identified herein, and others, have caused Debtor to take the extraordinary step of filing a voluntary petition under Chapter 11 of the Bankruptcy Code in order to (1) obtain breathing room to stabilize its finances and obtain final approval of its Flag Application; (2) allow for continued operations that will provide a future revenue stream within the Greensboro area and continued employment for both local employees and vendors, as well as employees and vendors worldwide; and (3) maximize all of its assets to provide the best possible plan for repayment to its creditors.

49. Debtor intends to accomplish its reorganization in several ways:

   a. First, Debtor is entering into its summer season which is the height of the season for the Charter Services as it is the busiest time from flights between China and Saipan. This will provide and immediate influx in revenue to help fund operations during the Chapter 11 Case.

   b. Upon final approval of the Flag Application, these seasonal Charter Operations within Asian will change to year-round Scheduled Services.

   c. A further benefit of approval of the Flag Application and the Expansion Plan is Debtor will not have to escrow customer deposits until flights are finished which will allow Debtor to utilize the proceeds to pay for amounts due for the flights as they are taken.

50. Debtor is aware that its reorganization plan will require substantial additional funds to cover the administrative expenses of the Chapter 11 Case, as well as any additional funds necessary to cover operational short-falls during the Chapter 11 Case. To that end, Mr. Woolley either individually or through a wholly-owned entity (the "Lender") has again emphasized its commitment to Debtor's efforts by providing a debtor-in-possession loan in the amount of $6,000,000, as discussed in further detail below.

51. Debtor's plan will address all valid claims against the Debtor, providing the best recovery for creditors in light of Debtor's situation, as well as pave the way for continued operations to allow for the ongoing benefit of continuing vendors, employees,

and the North Carolina community.

## FIRST DAY MOTIONS AND APPLICATIONS

52.     Debtor has commenced its Chapter 11 Case in response to the above-discussed obligations. Debtor's transition into its Chapter 11 proceeding must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy. It is important to minimize the distractions to Debtor's business operations that could result from Debtor petitioning for Chapter 11 relief.

53.     I have reviewed and am generally familiar with the contents of each of the First Day Motions. Based on that familiarity and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable Debtor to operate in its Chapter 11 Case with minimal disruption or loss of productivity or value. I also believe that the First Day Motions are in the best interests of Debtor and its creditors.

### A.    The DIP Financing Motion.

54.     Pursuant to the DIP Financing Motion, Debtor hereby requests: (i) entry of the Interim Order (a) approving on an interim basis the DIP Loan Agreement, (b) authorizing Debtor to obtain, on an emergency basis, advances in a sum not to exceed $2,300,000, (c) granting the Lender the liens and superpriority claims described in the Interim Order, and (d) scheduling a final hearing, and, after such hearing, (ii) entry of a Final Order (a) approving on a final basis the DIP Loan Documents, (b) authorizing Debtor to obtain post-petition financing up to the aggregate amount of the DIP Availability, (c) authorizing Debtor to pay all interest, fees, expenses, and other obligations provided for under the DIP Loan Documents, (d) granting the Lender the liens and superpriority claims described in the Final Order, and (e) authorizing Debtor to satisfy all conditions precedent and perform all obligations thereunder in accordance with the terms of the DIP Loan Documents

55. As a condition to the willingness of the Lender to fund the advances under the DIP Credit Facility to Debtor, Debtor seeks to grant the Lender automatically perfected a first-priority, senior lien and security interest in property of the Estate not otherwise subject to a lien and a junior lien in property of the Estate that is subject to a lien, pursuant to Sections 364(c)(2) and (3) and an allowed superiority claim for administrative expenses pursuant to the provisions of Sections 364(c)(1) of the Bankruptcy Code

#### 1.    Debtor's Need for Financing.

56.     Debtor requires approval of the DIP Credit Facility to fund operating expenses of Debtor in accordance with the Budget. While Debtor will receive revenues from operations during the period of the Budget, this is not sufficient to fund operating expenses and administrative claims.

57. The DIP Credit Facility includes sufficient funds to cover the projected operational expenses and administrative fees and costs related to the Chapter 11 Case. The Budget projects the operational costs and administrative fees related to the Chapter 11 Case for a period of six months from the petition date. It is assumed that Debtor will file a plan of reorganization during the exclusivity period and confirm a plan within the six-month period. However, Mr. Woolley is prepared to address an additional loan if required during the six-month period or subsequent thereto.

58. Debtor cannot meet its ongoing post-petition obligations unless it has the immediate authorization to access the DIP Credit Facility in accordance with the DIP Loan Agreement. In the absence of such use, immediate and irreparable harm will result to Debtor, the estate, and its creditors.

59. Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to borrowing availability to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business. Unless Debtor has access to such additional funds, Debtor's ability to maximize value through a reorganization will be jeopardized.

60. The continued maintenance of Debtor's business protects the estate's interests, and serves to mitigate the risk of diminution in value that could result if operating expenses, including payroll and the administrative expenses were not funded.

61. The requested relief is necessary for Debtor to preserve the going-concern value of its assets and to minimize the disruption of Debtor's efforts to reorganize in an orderly fashion. Debtor' post-Petition Date revenue is insufficient to fund its operational expenses and administrative costs, and a DIP Loan is its only source of funding to preserve and protect its assets for an orderly and efficient reorganization. Debtor will suffer immediate and irreparable harm unless it is immediately authorized to obtain financing in the amount and on the terms and conditions set forth in the Interim Order and the DIP Loan Agreement. Debtor believes that the terms and conditions of the DIP Loan Documents, the Interim Order, and Final Order and the related relief requested herein are fair, reasonable, and in the best interests of Debtor, its creditors, and its estate.

### 2. Approval Under Section 364 of the Bankruptcy Code.

62. Debtor has been unable to obtain, nor does it believe it would be unable to obtain, financing in the form of unsecured credit, allowable under Section 364(b) of the Bankruptcy Code as an administrative expense. Debtor is unable to obtain unsecured credit out of the ordinary course of business or credit with specialized priority or with security. The only party willing to lend funds to Debtor is Lender, which has agreed to provide a DIP loan to Debtor on the terms stated herein. Thus, Debtor proposes to obtain financing under the DIP Loan Documents, the Interim Order, and the Final Order pursuant to Sections 105 and 364(c) of the Bankruptcy Code.

### 3. Debtor Does Not Have an Alternative to the DIP Loan.

63. The Lender is uniquely positioned and motivated to assist Debtor in its

4844-3636-6922, v. 7

reorganization efforts. Lender is already, of course, familiar with Debtor's business operations, corporate structure, financing arrangements, and assets, and has already performed any due diligence necessary in connection with the DIP Credit Facility. Debtor believes that it could not obtain financing from any other lender on terms more favorable than the DIP Credit Facility offered by the Lender, or for that matter, on any terms, and certainly not before all of Debtor's limited cash resources were depleted by the search. The proposed DIP Credit Facility is the only financing available to Debtor. Debtor exercised its best business judgment in negotiating the DIP Loan Agreement and the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing.

### 4. Application of the Business Judgment Standard.

64. Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Loan Documents.

65. Debtor exercised its best business judgment in negotiating the DIP Loan Agreement and the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing.

### 5. Good Faith.

66. The proposed DIP Credit Facility is and will be the result of good faith negotiations, with all parties represented by counsel. Debtor believes that the terms of the DIP Loan are fair and reasonable under the circumstances, and that the Lender is in good faith and is entitled to the benefits of Section 364(e) of the Bankruptcy Code.

### B. The Employee Wage Motion.

67. As of the Petition Date, Debtor employed both in the United States and in foreign jurisdictions approximately 126 employees in the ordinary course of its business. Continued service by the Employees is vital to the value and preservation of Debtor's operations and assets.

68. As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Debtor for wages and salaries incurred in the ordinary course of Debtor's business, including any prepetition compensation (collectively, the "Employee Wage Obligations"). The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is approximately $525,334. Debtor pays its Employees twice per month, with the pay periods ending on the 15th and last day of each month, and checks being issued one week thereafter. The last payroll was made on July 7, 2017 for wages accrued through June 30, 2017

69. Debtor also relies on independent contractors ("Independent Contractors") in the ordinary course of their business. These Independent Contractors perform a wide range of services critical to Debtor's operations, including, among other things, providing information technology assistance, running critical training programs, and

operating as flight attendants on foreign flights. The Employees rely on the support of the Independent Contractors to complete certain tasks in furtherance of Debtor's business. Debtor believes the authority to continue paying its Independent Contractors is critical to maintaining and administering its estate.

70. As of the Petition Date, Debtor estimates that approximately 34 Independent Contractors and are owed an aggregate of approximately $72,800 on account of services rendered prior to the Petition Date, all of which will become due and owing post-Petition Date (the "Independent Contractor Wage Obligations," and together with the Employee Wage Obligations, the "Wage Obligations").

71. Additionally, Debtor provides certain Employees and Independent Contractors with a per diem amount in the ordinary course of business to pay for daily expenses (the "Per Diem Obligations"), which are paid in connection with the Wage Obligations. As of the Petition Date Debtor estimates that Per Diem obligations accrued but unpaid total approximately $ 90,240.

72. In the ordinary course of their employment, certain authorized Employees and Independent Contractors may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor ("Reimbursable Business Expenses"). The Chapter 11 Case was filed during Debtor's normal payroll periods for hourly and salaried Employees and during its normal reimbursement cycle for Reimbursable Business Expenses. Employees and Independent Contractors rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed. Debtor cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that such expenses total approximately $15,000. Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business

73. Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (and in certain cases with regard to Employees located in foreign jurisdictions, similar withholdings) and to remit the same to the appropriate taxing authorities. To the extent that Debtor has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes, and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.

74. In addition, Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance and workers compensation obligations (and in certain cases with regard to Employees located in foreign jurisdictions, similar payments) ("Tax Obligations"). Debtor seeks

authorization to continue to pay these funds in the ordinary course of business.

75.     In addition, in the ordinary course of its business, Debtor has accrued amounts for health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (and in certain cases with regard to Employees located in foreign jurisdictions, similar obligations) (collectively, the "Employee Benefit Plans"). These benefits include health plans (i.e. medical, dental, vision, and life insurance), health savings accounts, various welfare plans (i.e. life insurance, disability insurances, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee assistance programs. These employee benefit contributions (the "Employee Benefit Contributions," and together with the Wage Obligations, Per Diem Obligations, Reimbursable Business Expenses, and Tax Obligations, the "Employee Obligations") are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date is estimated to $93,981.

76.     Debtor's Wage Obligations and Employee Benefit Contributions to be paid to or for the benefit of each of the Employees pursuant to Debtor's wages and Employee Obligations Motion will not exceed $12,475.00 per employee.

77.     If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that certain essential Employees will resign and that those Employees that remain will be discontented.

78.     Debtor will have sufficient cash to honor all of the foregoing employee related obligations if debtor-in-possession financing is approved by the Court.

79.     Continued payment of Wage Obligations, Employee Benefit Contributions, and maintaining its workers' compensation system, are essential to preserve the morale and to maintain positive relations between Debtor and its Employees. If the relief requested in the Motion is not granted, the success of Debtor's Chapter 11 Case will be placed in substantial jeopardy.

C.      **The Cash Management Motion.**

80.     To manage its business efficiently and seamlessly, Debtor utilizes a centralized cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business.

81.     As part of the Cash Management System, Debtor proposes to maintain its existing bank accounts, which consist of the following accounts held at Bank of America ("BofA"): Acct No. XXXXXX1213, which is utilized as Debtor's deposit account, Account No. XXXXXX1239 which is utilized as Debtor's disbursement account, and Account No. XXXXXX1242 which is utilized as Debtor's sweep account (collectively, the "BofA Accounts"). Debtor also maintains a bank account in Ecuador to

receive payments for flights booked there. The Ecuadorian account is located at Produbanco, Account No. XXXXXXX051, with Wells Fargo Bank ("Wells Fargo") Account No. XXXXXXXXX1006 serving as the intermediary bank (collectively, the "Ecuador Account," and together with the BofA Account, the "Cash Accounts"). The Cash Accounts are essential for Debtor's continued operations.[4]

82.     In addition to the BofA Accounts, Debtor utilizes an escrow system to hold funds paid by customers for flights. The escrowed funds are collected by Base Commerce, LLC, a credit card processor, and delivered to Level One Bank ("Level One," and together with BofA, Produbanco, and Wells Fargo, the "Banks"), Account No. XXXXXX7806 (the "Escrow Account, and together with the BofA Accounts, the "Bank Accounts").

83.     To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of the Estate that Debtor be authorized to continue its ordinary course use of the Bank Accounts, rather than to close this account and then open a new account.

84.     Specifically, among other things, Debtor uses a series of credit card processors, which collect funds and distribute them directly to the Cash Accounts. The credit card processors include Base Commerce, LLC, SparrowOne, Airline Reporting Corporation, and American Express. Any changes to the BofA Accounts would result in Signiant disruption in the collection and distribution of these funds

85.     Likewise, requiring a new Escrow Account would result in the significant interruptions of the collection and transfer of consumer funds paid for current and future flights

86.     The Bank Accounts are used to pay all operating costs including automatic payments for utilities, Wage Obligations, and Employee Benefit Obligations. Closing the Bank Accounts would require that these automatic payments be reestablished and would result in significant delay in the delivery of necessary post-petition goods.

87.     Debtor's Cash Management System is an ordinary, usual, and important business practice. The Cash Management System enables Debtor to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to operations during the pendency of the Chapter 11 Case. If these practices and procedures are disrupted, Debtor's efforts to reorganize may be jeopardized.

88.     Debtor's Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Many corporate enterprises use these cash management systems because such systems provide numerous benefits. Among the most important of these benefits is the ability to control corporate funds and

---

[4] Debtor previously placed certain funds into an account in the name of Dynamic Airways Cargo, LLC, an affiliate entity without operations and employees, and no funds other than those contributed by Debtor. As of the Petition Date, Debtor no longer utilizes this account.

ensure cash availability, to reduce administrative expenses, and to have easy access to timely and accurate financial information.

89. Establishing a new cash management system would entail significant delay and cost. At a minimum, substantial disruptions to Debtor's business would occur by, among other things, delaying the payments to vendors and customers. This would in turn harm creditors, consumer confidence, and would hinder Debtor's chance to complete a successful sale.

90. Further, maintaining the existing Cash Management System would not prejudice any party. Debtor will maintain strict records with respect to all transfers of cash so that it is able to readily account for all transactions. Debtor's maintenance of its existing Cash Management System is not only of critical importance to Debtor's business operations, but is also in the best interest of Debtor, its estate, and creditors.

91. If the Cash Management System Accounts are disrupted, Debtor will experience immediate and irreparable harm.

92. Requiring Debtor to open new accounts would complicate Debtor's Cash Management System, needlessly increasing operating costs, and could otherwise jeopardize Debtor's operations entirely given the necessary reliance on holding funds in the Escrow Account prior to earning such funds.

### D.    The Customer Deposit Motion.

93. Prior to the Petition Date and in the ordinary course of its business, Debtor engaged in certain customer practices to pre-sell tickets and escrow funds so that Debtor could provide guarantees for bookings for individual future flights (the "Prepetition Tickets") and those for private charter service (the "Charter Sales Programs," and together with the Prepetition Tickets, the "Debtor's Flight Services"). Certain of the Prepetition Tickets offer various refund options (the "Refund Options," and together with the Prepetition Tickets and Charter Sales Programs, the "Customer Deposits" and the obligations thereunder and related thereto, collectively, the "Customer Deposit Obligations").

94. Absent the relief requested herein, the commencement of this Chapter 11 Case may negatively affect customers' attitudes and behavior toward the Debtor's services. These measures will quickly serve to demonstrate that the Customer Deposits will remain intact and that customers can rely on their bookings on an ongoing basis. Debtor's goodwill and ongoing business relationships may erode if its customers perceive that the Debtor is unable or unwilling to fulfill the prepetition promises it has made through the Customer Deposits. The same would be true if customers perceived that the Debtor will no longer be offering the types of or quality of services they have come to expect, and upon which those customers rely when purchasing the Debtor's services.

95. Debtor seeks authority to honor, by providing the service purchased by each customer, all tickets for airline travel that were purchased prepetition but have not yet been used. The inability to honor the Prepetition Tickets presented by customers

following the commencement of this Chapter 11 Case would cause irreparable harm to Debtor's reorganization efforts. Customer confidence and goodwill will be severely undermined if Debtor is prevented from honoring Prepetition Tickets.

96.     In addition, a significant portion of the Prepetition Tickets have been purchased by individuals for personal, family, or household use.

97.     For the current year, through June 30, 2017, the Debtor's Flight Service has generated in excess of $21 Million Dollars in sales.

98.     Through the Debtor's Flight Services, Debtor is able to secure future travel commitments and obtain advance cash payment. Debtor has made commitments and received deposits for the Debtor's Flight Services through, and in some instances beyond, 2017. If Debtor is not permitted to honor these obligations, long-standing relationships with these customers would be irreparably damaged, and the Debtor would lose a proven revenue base and reorganization efforts would be harmed.

99.     Debtor estimates that outstanding prepetition obligations for the Debtor's Flight Services are approximately $7,625,000. Debtor seeks authority to honor prepetition obligations under the Debtor's Flight Services in the ordinary course of business.

100.    Debtor also sells certain Prepetition Tickets that offer customers the ability to obtain a refund for a small fee (the "Refund Options") if a customer chooses to cancel or reschedule a flight.

101.    To remain competitive with other carriers and to retain the goodwill and confidence of its customers and travel agents, it is extremely important that Debtor continue to honor the Refund Options. Maximum potential obligations related to the Refund Options are less than 15% of total sales. However, to the contrary, the failure to honor the Refund Options would have a devastating effect on Debtor's customer base and operations

102.    Maintaining the refundability of tickets purchased prepetition will enhance the public's confidence in Debtor's continued reliability and operations.

E.     **The Utility Motion.**

103.    In the ordinary course of its business, Debtor incurs utility expenses for electricity, water, waste management, cellular service, and internet. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on **Exhibit "2"** to the Utility Motion (the "Utility Service List").

104.    On average, Debtor spends approximately $24,000 each month on utility

costs.[5] As of the Petition Date, Debtor understands that it is behind on several of the utility payments set forth in the Utility Service List that came due on or before the Petition Date.

105. Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its Chapter 11 Case. Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively affecting customer relationships and revenues. Such a result could jeopardize Debtor's sale efforts and, ultimately, Debtor's value. It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

106. Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Debtor expects that it will have ample funds, based upon proposed financing, to pay its post-petition obligations to its Utility Providers. Specifically, Debtor has sought concurrently herewith, approval of post-petition financing to cover all budgeted post-petition expenses.

107. To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $25,000 (representing more than one month's average utility expense) to be made available from Debtor's proposed DIP Credit Facility for payment of utility payments (the "<u>Utility Reserve</u>"). The Utility Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively, with the Utility Reserve, the "<u>Proposed Adequate Assurance</u>"). Debtor submits that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

108. The proposed procedures are necessary for Debtor to carry out its Chapter 11 efforts. If they are not approved, Debtor could be forced to address a host of requests by its Utility Providers in a disorganized manner during the critical first weeks of its Chapter 11 Case. Moreover, Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly electricity, could essentially shut down operations, and any significant disruption of operations could put the Debtor's sale efforts and business value in jeopardy.

F. <u>The Employment Application.</u>

109. Debtor has selected GTG as its attorneys because of the firm's knowledge of Debtor's business and financial affairs and GTG's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code. Regarding airlines and aircraft, GTG and its attorneys have represented debtors, equity holders,

---

[5] To calculate the approximate monthly expenditure for utility costs, Debtor determined the average costs based on actual costs over a twelve-month period.

creditors and aircraft lessors and secured lenders.

110. The terms of GTG's retention are set forth in the Legal Representation Agreement (the "<u>GTG Retention Agreement</u>") attached to the declaration of exhibit supplement in support of the Employment Application as **Exhibit "1."** The GTG Retention Agreement permits GTG to bill Debtor for services performed at current and customary hourly rates and current charges for certain expenses, and that such matters are subject to reconsideration on a semi-annual basis. Gerald Gordon is the attorney principally responsible for the representation and his rate is $725.00 per hour, which represents a $50 reduction from his customary hourly rate of $775.00.

111. During the course of this representation, GTG has become familiar with Debtor's business, financial affairs, and capital structure. Accordingly, GTG has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of Debtor's Chapter 11 Case. GTG is both well-qualified and able to represent Debtor in its Chapter 11 Case in a most efficient and timely manner.

112. Debtor has selected Bell, Davis & Pitt as its local counsel because of the firm's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code in the Middle District of North Carolina

113. The terms of BDP's retention are set forth in the Legal Representation Agreement (the "<u>BDP Retention Agreement</u>") attached to the exhibit supplement in support of the Employment Application as **Exhibit "1."** The BDP Retention Agreement permits BDP to bill Debtor for services performed at current hourly rates and current charges for certain expenses, and that such matters are subject to reconsideration on a semi-annual basis. Wrennie Pitt and Daniel Bruton are the attorneys principally responsible for the representation and their rates are $450 and $350 per hour, respectively.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 19 day of July, 2017.

_____
PAUL KRAUS

4844-3636-6922, v. 7