UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                              )
                                    )
DYNAMIC INTERNATIONAL              )      Case No. 17-10814
AIRWAYS, LLC                       )      Chapter 11
                                    )
        Debtor.                     )
_____)

**EMERGENCY MOTION SEEKING INTERIM AND FINAL ORDERS: (1)
AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (2)
GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE,
AND (3) SETTING AND PRESCRIBING THE FORM AND MANNER OF
NOTICE FOR A FINAL HEARING**

Dynamic International Airways, LLC, a Virginia limited liability company, debtor

and debtor-in-possession ("Debtor"), hereby submits its motion (the "Motion") for entry

of an interim order (the "Interim Order," or "Order") a copy of which is attached hereto

as **Exhibit "1"** and setting a final hearing for the entry of a final order (the "Final

Order"): (1) authorizing Debtor to enter into a debtor-in-possession credit facility (the

"DIP Credit Facility") pursuant to Sections[1] 105 and  364 of title 11 of the United States

Code (the "Bankruptcy Code") with Solitude Strategies, LLC,[2] as lender (the "Lender");

(2) granting the Lender liens and allowing the Lender's claim as an administrative

expense priority pursuant to Sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code;

and (3) in accordance with Rules 4001(b)(2) and (c)(2) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and all applicable local bankruptcy

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "LBR" shall refer to the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court for the Middle District of North Carolina

[2] Solitude Strategies, LLC is owned equally by Paul Kraus and Kenneth M. Woolley, Debtor's ultimate principals.

rules, scheduling a final hearing (the "Final Hearing") on the Motion, and approving notice with respect thereto.

# I.
## BANKRUPTCY RULE 4001 CONCISE STATEMENT

By this Motion, Debtor requests:[3] (a) entry of the Interim Order and the Final Order authorizing Debtor: (i) to obtain post-petition financing pursuant to Sections 105 and 364 of the Bankruptcy Code up to a maximum principal amount of $6,000,000 (the "DIP Obligations"), in accordance with the *Debtor-In-Possession Loan and Security Agreement* attached hereto as **Exhibit "2"** (the "DIP Loan Agreement"), executed among Debtor, as borrower, and the Lender, and the Budget, attached hereto as **Exhibit "3"**, and any related documents to be drafted and required to be delivered in connection with the DIP Loan Agreement (collectively, with the DIP Loan Agreement, the "DIP Loan Documents"); (ii) to authorize Debtor under Sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code to grant (A) a first-priority, senior lien and security interest in property of the Estate not otherwise subject to a lien; (B) a junior lien in property of the Estate that is subject to a lien; and (C) a superpriority administrative expense claim to the Lender subject to the "Carve Out" defined below; and (iii) pending a final hearing, to and including the date on which the Final Order is entered, to obtain emergency post-petition advances in the amount of $1,500,000, if a final hearing is held on or before August 12, 2017, or in the amount of $2,300,000 if a final hearing is held during the week of August 19, 2017; and (b) in accordance with Bankruptcy Rules 4001(b)(2) and (c)(2), to schedule the Final Hearing and approve notice with respect thereto.

The material provisions of the proposed debtor-in-possession financing are summarized as follows:

   a.    **Borrower**: Debtor. See DIP Loan Agreement at 1.

---

[3] The following is a brief summary only, and nothing herein is intended or should be construed as altering or amending the DIP Loan Agreement.

b.    **Lender**: Solitude Strategies, LLC.  See id.

c.    **Commitment**:  A Maximum Amount of up to Six Million and 00/100 Dollars ($6,000,000).  See id. at p. 1. Under the Interim Order, Debtor may request to obtain emergency post-petition advances in the amount of One Million Five Hundred Thousand $1,500,000, if a final hearing is held on or before August 12, 2017, or in the amount of Two Million Two Hundred Thousand and 00/100 Dollars ($2,300,000) if a final hearing is held during the week of August 19, 2017.  See id. at 1-3.

d.    **Term.**  The earliest of (i) December 31, 2017 (the Maturity Date); (ii) the occurrence of a Default or an Event of Default (as defined in the DIP Loan Agreement); (iii) the Effective Date of a plan of reorganization confirmed in the Chapter 11 Case.  See id. at 1.

e.    **Purpose**:  For general corporate purposes of the Borrower and working capital, including without limitation, payment and reimbursement of (a) Borrower's operating expenses, and (b) the fees, costs and expenses incurred by Borrower as a debtor-in-possession in the Bankruptcy Case, which fees and expenses include but are not limited to, payment of the fees and expenses of Borrower's professionals ("Professionals") retained pursuant to Sections 327 and 328 of the Bankruptcy Code up to the amounts permitted in the Budget.  See id. at 5.

f.    **Collateral.**  Subject to the Carve Out (defined below), pursuant to Sections 364(c)(2) and (3), Borrower grants, pledges, conveys and assigns to Lender a continuing security interest in all property of Debtor's estate that is not subject to an existing pre-Petition Date lien and a junior lien in all inventory and accounts receivable of Seller (the "Collateral"); provided however, the Collateral shall not include rights and actions arising under Sections 502(d), 544, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.  See id. 1.

g.    **Allowance of Superpriority Claim.**  To the extent not adequately protected by the liens conferred and contemplated hereunder, Lender shall be granted a priority administrative claim pursuant to Section 364c)(1) of the Bankruptcy Code, that is subject to the payment of the Carve Out, with regard to the payment and performance by Borrower of all terms, covenants, and conditions under the Loan Documents, including, without limitation, repayment of all Loan amounts advanced by Lender to Borrower, and such administrative claim shall have priority over all administrative expenses of the kind specified in Sections 503(b) of the Bankruptcy Code; provided however, the Collateral shall not include rights and actions arising

under Sections 502(d), 544, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code. <u>See</u> <u>id.</u> at 1, 9.

h.     **Carve-Out.** An amount not to exceed (i) Two Hundred Thousand Dollars ($200,000) for the administrative professional fees and costs for professionals as approved and allowed by the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code, which Two Hundred Thousand Dollars ($200,000) shall include those amounts being held by Borrower's professionals as retainers as of the Petition Date. In the event that an unsecured creditors committee (the "<u>Committee</u>") is formed and retains professionals, the committee and its professionals shall be limited to no more than $15,000 in approved fees and costs for (A) investigating, objecting, contesting or raising any defense to the validity, perfection, priority, extent or enforceability of any amount due under the Loan or the claims and liens granted pursuant to Section 364(c)(1), (2) and (3), (B) asserting any claim or cause of action against Lender or its respective agents, affiliates, representatives, attorneys or advisors, (C) seeking to modify any of the rights granted to Lender under the Order, or (D) to formulating, proposing or confirming a plan of reorganization, in each of the foregoing circumstances without Lender's prior written consent. <u>See</u> <u>id.</u> at 9, 4.

i.     **Interest**: Interest shall accrue in respect of all DIP Obligations (as defined in the Loan Agreement) at the Interest Rate of six percent (6%) and, following the occurrence of an Event of Default (defined below), eleven percent (11%). <u>See</u> <u>id.</u> at 2.

j.     **Events of Default**: The Events of Default are set forth in pages 7-9 of the DIP Loan Agreement. The Events of Default contain standard provisions for debtor-in-possession financing. <u>See</u> <u>id.</u> at 7-9.

k.     **Automatic Stay**: In the Event of Default, Lender may seek a hearing for relief of the automatic stay set forth in Section 362 of the Bankruptcy Code to enforce any and all rights and remedies granted to Lender under the Loan Documents and applicable state and federal law, including without limitation, the exercise of any prejudgment remedies by Lender upon three days' notice to the Bankruptcy Administrator, the top 20 unsecured creditors or, if an unsecured creditors committee has been appointed, to the unsecured creditors committee, and any other party filing a request for notice in the Bankruptcy Case. <u>See</u> <u>id.</u> at 9.

l.     **Representations and Warranties**. The representation and warranties are set forth in pages 4-5 of the DIP Loan Agreement. The representation and

warranties contain standard provisions for debtor-in-possession financing. See id. at 4-5.

m. **Indemnification**. Borrower will indemnify and hold Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by Lender to Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees. This indemnity extends to Lender and all of Lender's directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of Borrower's obligations to Lender. All sums due to Lender hereunder shall be obligations of Borrower, due and payable immediately without demand. See id. at p. 10.

n. **Budget.** The Budget reflecting Debtor's projected cash flow needs through January 6, 2018, is attached to the Exhibit Supplement Exhibit 3.

## II.
## STATUS OF THE CASE AND JURISDICTION

1.     On July 19, 2017 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code thereby commencing the above-captioned case (the "Chapter 11 Case"). Debtor has continued in the possession of its property and is operating and managing its business as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.     No request for a trustee or examiner has been made and no creditors' committee has yet been appointed in this case. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D) and (O). Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are Sections 105(a), and 364 of the Bankruptcy Code, Bankruptcy Rules 4001, 6004, and 9014.

# III.
# BACKGROUND

## A.    Debtor's Operations

### a.    Debtor's Current Operations.

1.    Debtor is a Virginia limited liability company formed in 2010 that operates in High Point, North Carolina.  Debtor is owned by members Commercial Aircraft Services Holdings, LLC, NVLV Management LLC, and the F. Paul Ohadi Trust dtd 12/15/99. See Omnibus Decl. ¶ 4.[4]

2.    Debtor's ultimate principals are myself, through my ownership of Commercial Aircraft Services Holdings, LLC, and Kenneth M. Woolley, through his ownership of NVLV Management, LLC. We acquired the business in 2013.  See id. ¶ 5.

3.    Debtor owns and operates a full-service aviation enterprise, and is a licensed and certificated air carrier authorized by the U.S. Department of Transportation (the "DOT") and the U.S. Federal Aviation Administration (the "FAA").  Debtor holds a Part 121 Certificate (large aircraft) and operates as a supplemental air carrier, providing charter and contract commercial passenger air travel services to the general public.  See id. ¶ 6.

4.    Debtor's fleet of aircraft includes the following six Boeing 767s (the "Leased Aircraft"), which complete international flights between United States cities and territories and foreign countries:

   a.    A Boeing 767-23B bearing serial number 23974 and U.S. Registration Mark N253MY leased from KMW Leasing IV, LLC;

   b.    A Boeing 767-246 bearing serial number 23213 and U.S. Registration Mark N767DA leased from KMW Leasing IX, LLC;

   c.    A Boeing 767-336 bearing serial number 24339 and U.S. Registration Mark N796MY leased from KMW Leasing N796JM, LLC;

   d.    A Boeing 767-336 bearing serial number 25443 and U.S. Registration

---

[4] The Omnibus Declaration refers to the *Omnibus Declaration of Paul Kraus in Support of Debtor's Chapter 11 Petition, First Day Motions, and Employment Application*, filed concurrently herewith.

Mark N254MY leased from KMW Leasing VII, LLC;

    e.  A Boeing 767-336 bearing serial number 24343 and U.S. Registration Mark N740JM leased from KMW Leasing X, LLC

    f.  A Boeing 767-300ER bearing serial number 24342 and U.S. Registration Mark N793JM leased from KMW Leasing X, LLC

See id. ¶ 7. (KMW Leasing IV, LLC, KMW Leasing IX, LLC, KMW LeasingN796JM, LLC, KMW Leasing VII, LLC, and KMW Leading X are collectively referred to as the "KMW Entities").

    5.    Currently, Debtor's operations include the following major scheduled charter flights between the following airports:

    a.  John F. Kennedy International Airport in New York and Cheddi Jagan International Airport in Guyana year-round, five days a week;

    b.  John F. Kennedy International Airport in New York and Jose Joaquin de Olmedo International Airport in Ecuador year-round, between two and seven days a week depending on seasonal need;

    c.  Ontario International Airport in California and Nanchang Changbei International Airport in Nanchang, China (through Ted Stevens Anchorage International Airport in Alaska) seasonally four days a week;

    d.  Nanjing Lukou International Airport in Nanjing, China and Saipan International Airport in the Northern Mariana Islands several days a week during July and August;

    e.  Nanchang Changbei International Airport in China and Saipan International Airport in the Northern Mariana Islands several days a week during July and August; and

    f.  Changchun Longjia International Airport in Jilin Province and Saipan International Airport in the Northern Mariana Islands several days during July and August; and

    g.  ACMI/Wet Lease[5] operations and ad-hoc charter as required by customers services

See id. ¶ 8. (the "Scheduled Charter Services").

---

[5] ACMI/Wet Lease generally refers to a leasing arrangement whereby Debtor provides an aircraft, complete crew, maintenance, and insurance (ACMI) to another airline or broker, which paus by hours operated.

6.     Under its supplemental certificate, Debtor also provides other contract and charter flights and services on an as-needed and as-commissioned basis (the "Additional Charter Operations," and together with the Scheduled Charter Operations, the "Charter Operations"). See id. ¶ 9.

### b. Debtor's History and Vision.

7.     There is an outstanding marketplace that is mainly unserved by United States airlines called secondary cities. As an example, Nanjing, China has a population of 8.2 million people, Ningbo, China has a population of 7.6 million people, and Hangzhou, China has a population of 9.1 million people.  In contrast, Los Angeles, California has a population of 4 million people. Chinese inbound tourism into the United States has had enormous growth over the past seven years. In 2010, 800,000 Chinese people visited the United States. In 2016, 3.01 million Chinese people visited and, by 2020, it is projected that the number of Chinese tourists will increase to 6 million. Furthermore, in 2016 Chinese tourists spent $29 billion dollars while traveling to the United States.  See id. ¶ 10.

8.     When Mr. Woolley and I acquired Debtor in 2013, our sole intention was to position Debtor to operate to and from China with scheduled operations, as opposed to the Charter Operations that Debtor had been operating and continues to operate. In short, airlines can transport passengers in two ways: (1) through common carriage, published schedules, with published fares as one would normally see with the typical larger existing airlines ("Scheduled Services") or (2) through the Charter Services.  Obviously, the Scheduled Services provide greater flexibility and scale for operations and capturing the growth of Chinese travel to United States cities and territories. See id. ¶ 11.

9.     Over the past four years, Debtor has uniquely positioned itself to capture the market for Scheduled Services. See id. ¶ 12.

10.     First, in June 2013, Debtor filed its application for a China Civil Aviation Regulations Part-129 certificate ("CCAR-129").  The Civil Aviation Administration of

China ("CAAC") approved the CCAR-129 on December 31, 2013.    The approval marked Debtor's formal engagement to enter Charter Services between the China mainland and United States territories. Debtor launched its Charter Services from Tianjin and Hangzhou, China to Saipan as well as Beijing, Dalian, and Chengdu, China to Guam during the 2014 Chinese New Year holiday period. From May to July in 2014, Debtor also provided Charter Services from Hong Kong to Saipan. See id. ¶ 13.

11.    On June 21, 2014, Debtor and the Guam Visitors Bureau cooperated to launch Charter Services from Beijing and Guam.  This cooperation ended a long history of no direct flights between China and Guam and was so celebrated that China Central Television ("CCTV") reported the inauguration news.  See id. ¶ 14.

12.    This historic route operated every six days for more than three months with twenty-two flights, and took over 2200 Chinese visitors to Guam.  See id. ¶ 15.

13.    On December 28, 2014, Debtor launched Charter Services on the Changsha (China)-Anchorage-Los Angeles route, which was the first commercial flight between the Hunan Province and the United States mainland. See id. ¶ 16.

14.    Starting in September 2014, Debtor operated three bi-weekly Charter Services between Hong Kong and the Republic of Palau, which later increased to twice weekly.  This route has lasted for fourteen months.  See id. ¶ 17.

15.    In 2015, Debtor continuously operated Charter Services from various Chinese cities to Guam, and opened summer Charter Services from Hong Kong to Saipan. From September to November in 2015, Debtor operated two months of incentive Charter Services from Shijiazhuang, China to Saipan and took over 2300 Chinese visitors to Saipan. See id. ¶ 18.

16.    By 2016, Debtor not only had holiday Charter Services from several Chinese cities to Guam, but also had Charter Services from Tianjin, Shenyang, Jinan, Nanjing, Hangzhou and Shijiazhuang, China to Saipan. See id. ¶ 19.

17.    In October and November 2016, Debtor launched the Nanchang (China)-

Anchorage-Los Angeles route for the Jiangxi province, again ending a historical lack of direct flights between Jiangxi province and the United States mainland. See id. ¶ 20.

18.    Most recently, during the 2017 Chinese New Year, Debtor operated Charter Services from Jinan, Wuxi, Hangzhou, Ningbo, Shijiazhuang, and Nanchang, China to Saipan and transported over 5000 Chinese visitors. See id. ¶ 21.

19.    As of the Petition Date, Debtor holds fourteen Chinese cities on its CCAR-129, leaving two more cities in which Debtor can and will still expand. The following Chinese cities are approved for Debtor's flights: Beijing (PEK), Changsha (CSX), Chengdu (CTU), Dalian (DLC), Hangzhou (HGH), Jinan (TNA), Nanjing (NKG), Ningbo (NGB), Shenyang (SHE), Shijiazhuang (SJW), Tianjin (TSN), Zhengzhou (CGO), Nanchang (KHN), Wuxi (WUX). See id. ¶ 22.

20.    Debtor is approved to fly to more Chinese cities than any other USA based carrier. This unique focus has positioned Debtor for serving markets with both Charter Services and Scheduled Services that no other United States carrier has provided and created a unique business model that, upon Debtor's reorganization under Chapter 11, will provide significant future income. See id. ¶ 23.

### c.    Debtor's Proposed Expansion to Scheduled Services

21.    While Debtor's services are currently limited to the Charter Operations as it is only authorized to perform supplemental operations, Debtor has submitted an application (the "Flag Application") to expand its operations to include a FAR 121 Flag Operation and become a Flag Carrier (the "Expansion Plan") to be able to fly Scheduled Services. See id. ¶ 24.

22.    In short, a Flag Carrier is permitted to operate its own flights between any point in the U.S. or a territory thereof instead of being required to operate such flights through Charter Services.  This system has the significant benefits of, among other things, increased revenue and direct sales to consumers with immediate access to client funds instead of having to be processed through Escrow Accounts (as defined below).

See id. ¶ 25.

23.     Furthermore, the CAAC's of strict regulations for Charter Services means expanding to provide Scheduled Services will result in significant benefit to Debtor.

a.  First, the CAAC limits Charter Services to operating any single city pair route no more than 90 days continuously and no more than 120 days in one year, which restriction is eliminated for Scheduled Services.

b.  Second, once Scheduled Services are established, no Charter Services are accepted for the same city pair thereby making Debtor the sole operator for those same city pairs.

c.  Third, currently Charter Services approval only could be issued monthly and no application can be accepted over one month making the administrative burden for constant and uncertain applications consuming.

d.  Fourth, Charter Services have the lowest priority for scheduling, meaning that Charter Services always receive the worst time slots. This also means that where no time slots remain at an airport, which is frequently the case for busy airports like Beijing, Charter Services cannot operate.

See id. ¶ 26.

24.     The Flag Application to allow Debtor to switch to Scheduled Services was submitted to the DOT and FAA over two years ago.  Debtor has received preliminary approval of the Flag Application.  However, as a result of some of the temporary operational challenges described herein, final application has been temporarily delayed, although Debtor anticipates achieving such final approval during the Chapter 11 Case. See id. ¶ 27.

25.     Once the United States DOT finally approves the Flag Application, granting Debtor Flag Status (described in more detail herein), Debtor will be able to carry out the business plan contemplated since my and Mr. Woolley's acquisition of Debtor.  See id. ¶ 28.

26.     Specifically, most of Debtor's Charter Services routes in China are ready to

turn to Scheduled Services and the market has been well developed. Debtor is a well-known Charter carrier in China. See id. ¶ 29.

27.     Debtor's General Service Agent ("GSA") in China is CITS which is the largest central government owned public tourism group company. CITS has over 4000 locations in the major cities all over China and its sales chain covers over-the-counter sales to the Chinese online travel agencies. See id. ¶ 30.

28.     Debtor's China office is located inside the CITS building in the center of Beijing City. CITS has strong government relationship which can strongly support Debtor's doing business in China. The relationship has helped Debtor develop rapidly and earn good business reputations in the market. See id. ¶ 31.

29.     As we have done so through its entire operations, Mr. Woolley and I remain committed to making Debtor a successful operation and honoring its initial goal of providing reliable and quality air travel for areas that are in need of additional options and specifically, to starting and growing Scheduled Services in Asia. See id. ¶ 32.

**B.      Debtor's Capital Structure.**

30.     Debtor's debt, other than vendor payables and arbitration awards and judgments, is primary limited to loan obligations owed to myself and Mr. Woolley.  The Debtor has no secured debt other that in favor of Mr. Woolley mentioned below. See id. ¶ 33.

31.     As of the Petition Date, I have contributed more than $12 Million to Debtor through various capital contributions. See id. ¶ 34.

32.     As of the Petition Date, Debtor had approximately $12.1 Million in obligations to Mr. Woolley for moneys loaned. Approximately $6,000,000 is secured by all of Debtor's personal property, including accounts receivable, perfected pursuant to a UCC-1 financing statement filed in Virginia in August 2016.  The remaining balance is unsecured and reflected in the promissory notes executed between August and September 2016. These unsecured amounts are in addition to the nearly $35 Million that Mr.

Woolley has contributed to Debtor through various capital contributions. See id. ¶ 35.

33.    Mr. Woolley is also the manager and member of the KMW Entities which are collectively owned more than $10,500,000 in unpaid rent for the Leased Aircraft accruing since December 2015. See id. ¶ 36.

## C.    The Events Necessitating the Bankruptcy Filing.

### a.    Past Management Changes and Resulting Challenges.

34.    Debtor has consistently sought to retain high quality and experienced individuals to control the operations and finances of the Debtor. However, over the past several years, Debtor has encountered significant challenges in finding and retaining qualified employees. See id. ¶ 37.

35.    For example, since 2013, Debtor has had three chief executive officers, four chief operating officers, and three chief financial officers.  While such actions have not impacted the ultimate financial stability or safety of Debtor's operations, it has led to significant cash losses.  These management changes also resulted in different accounting and operations tracking systems which has caused some confusion and some items to be overlooked and not properly handled. See id. ¶ 38.

36.    Despite these losses and changes, Debtor's principals have remained committed to funding Debtor and pursuing the Expansion Plan so that operations can continue, employees can retain their jobs, and creditors can be paid. See id. ¶ 39.

37.    Most recently debtor has retained MJAC L.L.C. d/b/a Allison Consulting ("MJAC"), A North Carolina Limited Liability Company.  MJAC LLC  provides financial and operations counseling to national and local businesses (specializing in turnarounds and performance improvement).  It is currently engaged to assist the company in evaluating its long-term viability and to advise management as to short-term issues relating to cash flow, profitability, operations and finance. See id. ¶ 40.

38.    MJAC's review has revealed a series of challenges that require Debtor to seek the protections afforded by the Bankruptcy Code to allow the Debtor a chance to

take control of and reorganize its existing financings and operations. See id. ¶ 41.

39.     These challenges include:

    a.  Debtor is involved in a series of arbitrations and litigation related to its 2014 contract with Air India, Ltd. ("Air India") concerning a charter service for the 2014 Haj Pilgrimage to Mecca.   While Debtor performed under the contract, full payment was not provided resulting in several disputes.

        i.  Initially, Debtor filed a lawsuit in the United States District Court for the Southern District of New York against Air India. Over Debtor's objection, Debtor was forced to engage in arbitration in India, which resulted in an approximately $11 million arbitration award against Debtor.   Debtor is in the process of appealing the arbitration award in India.

        ii.  The lack of payment by Air India to Debtor resulted in arbitration demands being filed by three parties to whom Debtor was allegedly required to make payments: BKP Enterprise ("BKP"), Expim International ("Expim"), and Worldwide Charter Group ("Worldwide," and together with BKP and Expim, the "Arbitration Creditors").

        iii.  BKP and Expim obtained a combined arbitration award in Canada in a combined approximate amount of $3.5 million (the "BKP and Expim Award").   While Debtor has filed a notice of appeal and intent to challenge the BKP and Expim Award, it was nonetheless confirmed and judgment entered by the United States District Court for the Middle District of North Carolina on May 31, 2017.

        iv.  Worldwide obtained an arbitration award in Canada in the approximate amount of $900,000 (the "Worldwide Award"). Debtor is in the process of examining its rights and options as it related to the award in favor of Worldwide Award.

    b.  PMC Aviation 2012-1 LLC ("PMC") obtained a judgment against Debtor in the amount of $1,190,807.24 entered in the Circuit Court of Rockingham County in Virginia on or about June 26, 2017 (the "PMC Judgment").   Debtor is in the process of examining its rights and options as it related to this judgment. However, PMC has indicated an intent to commence aggressive collection efforts on the PMC Judgment and, on July 18, 2017, garnished certain of Debtor's bank accounts.

    c.  Pas Consulting Group, LLC ("Pas") obtained a judgment against Debtor in the amount of $151,743.50 entered in the United States

District Court for the Southern District of Florida on or about May 25, 2017 (the "Pas Judgment").  Debtor is in the process of examining its rights and options as it related to this judgment. However, Pas has commenced collection efforts on the Pas Judgment

d.  Debtor has other vendors that have, in the past, gone unpaid which has resulted in, among other things, garnishments against Debtor's bank accounts.  Although Debtor has worked through these garnishments, Debtor needs additional time to review any other outstanding liabilities and determine a plan for repayment.

See id. ¶ 42.

40.     The management changes, along with the legal and accounting challenges Debtor has encountered, is the primary reason for the delay of final approval of the Flag Application.  Specifically, Debtor is informed and believes that once these issues are resolved, which Debtor can achieve through its Chapter 11 Case and present management, the DOT and FAA are likely to grant final approval of the Flag Application and Debtor may commence its expanded operations.  See id. ¶ 43.

**b.  Debtor Is Required to Advance Funds Necessary to Complete Flights.**

41.     As Debtor's is currently limited to Charter Operations, federal regulations generally require that passenger payments for tickets be held in escrow until the passenger's flight has been completed.  See id. ¶ 44.

42.     Specifically, a passenger's funds are initially restricted funds held in an escrow account controlled by Shelby Financial Services (the "Escrow Accounts").  The Escrow Account functions as a restricted escrow account, in which all customer charter funds are deposited until the applicable charter flight is flown.  See id. ¶ 45.

43.     Upon completion of the flights, the escrowed funds, are deposited into the Debtor's operating account to satisfy the operating expenses associated with Debtor's business. See id. ¶ 46.

44.     As a result, Debtor is required to essentially advance all funds necessary to operate the charter flights in the short term.  This point is critical because the mounting

pressure of outstanding pending awards and judgments puts Debtor at risk of interrupted operations absent the protections of this Court. See id. ¶ 47.

**D.    Debtor's Plan to Reorganize**

45.    The combination of the factors identified herein, and others, have caused Debtor to take the extraordinary step of filing a voluntary petition under Chapter 11 of the Bankruptcy Code in order to (1) obtain breathing room to stabilize its finances and obtain final approval of its Flag Application; (2)  allow for continued operations that will provide a future revenue stream within the Greensboro area and continued employment for both local employees and vendors, as well as employees and vendors worldwide; and (3) maximize all of its assets to provide the best possible plan for repayment to its creditors.  See id. ¶ 48.

46.    Debtor intends to accomplish its reorganization in several ways:
   a. First, Debtor is entering into its summer season which is the height of the season for the Charter Services as it is the busiest time from flights between China and Saipan.  This will provide and immediate influx in revenue to help fund operations during the Chapter 11 Case.

   b. Upon final approval of the Flag Application, these seasonal Charter Operations within Asian will change to year-round Scheduled Services.

   c. A further benefit of approval of the Flag Application and the Expansion Plan is Debtor will not have to escrow customer deposits until flights are finished which will allow Debtor to utilize the proceeds to pay for amounts due for the flights as they are taken.

See id. ¶ 49.

47.    Debtor is aware that its reorganization plan will require substantial additional funds to cover the administrative expenses of the Chapter 11 Case, as well as any additional funds necessary to cover operational short-falls during the Chapter 11 Case. To that end, Mr. Woolley either individually or through a wholly-owned entity (the "Lender") has again emphasized its commitment to Debtor's efforts by providing a debtor-in-possession loan in the amount of $6,000,000, as discussed in further detail

below. See id. ¶ 50.

48.    Debtor's plan will address all valid claims against the Debtor, providing the best recovery for creditors in light of Debtor's situation, as well as pave the way for continued operations to allow for the ongoing benefit of continuing vendors, employees, and the North Carolina community.  See id. ¶ 51.

## IV.
## RELIEF REQUESTED

49. Debtor hereby requests: (i) entry of the Interim Order (a) approving on an interim basis the DIP Loan Agreement, (b) authorizing Debtor to obtain, on an emergency basis, advances in the amount of $1,500,000, if a final hearing is held on or before August 12, 2017, or in the amount of $2,300,000 if a final hearing is held during the week of August 19, 2017, (c) granting the Lender the liens and superpriority claims described in the Interim Order, and (d)  scheduling a final hearing, and, after such hearing, (ii) entry of a Final Order (a) approving on a final basis the DIP Loan Documents, (b) authorizing Debtor to obtain post-petition financing up to the aggregate amount of the DIP Availability, (c) authorizing Debtor to pay all interest, fees, expenses, and other obligations provided for under the DIP Loan Documents, (d) granting the Lender the liens and superpriority claims described in the Final Order, and (e) authorizing Debtor to satisfy all conditions precedent and perform all obligations thereunder in accordance with the terms of the DIP Loan Documents.  See Omnibus Declaration, ¶ 54.

50. As a condition to the willingness of the Lender to fund the advances under the DIP Credit Facility to Debtor, Debtor seeks to grant the Lender automatically perfected a first-priority, senior lien and security interest in property of the Estate not otherwise subject to a lien and a junior lien in property of the Estate that is subject to a lien, pursuant to Sections 364(c)(2) and (3) and an allowed superiority claim for administrative expenses pursuant to the provisions of Sections 364(c)(1) of the Bankruptcy Code.  See

id. ¶ 55.

## V.
## BASIS FOR RELIEF REQUESTED

**A.**    **Debtor's Need for Financing.**

51. Debtor requires approval of the DIP Credit Facility to fund operating expenses of Debtor in accordance with the Budget.  While Debtor will receive revenues from operations during the period of the Budget, this is not sufficient to fund operating expenses and administrative claims.  See id. ¶ 56.

52. The DIP Credit Facility includes sufficient funds to cover the projected operational expenses and administrative fees and costs related to the Chapter 11 Case, and the expenses related to the bankruptcy process. The Budget projects the operational costs and administrative fees related to the Chapter 11 Case.  It is assumed that Debtor will file a plan of reorganization during the exclusivity period and confirm a plan within the six-month period.  However, Lender is prepared to address an additional loan if required during the six-month period or subsequent thereto.  See id. ¶ 57.

53. Debtor cannot meet its ongoing post-petition obligations unless it has the immediate authorization to access to the DIP Credit Facility in accordance with the DIP Loan Agreement. In the absence of such use, immediate and irreparable harm will result to Debtor, the estate, and its creditors.   See id. ¶ 58.

54. Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to borrowing availability to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business.  Unless Debtor has access to such additional funds, Debtor's ability to maximize value through an orderly reorganization process will be jeopardized. See id. ¶ 59.

55. The continued maintenance of Debtor's business protects the estate's interest, and serves to mitigate the risk of diminution in value that could result if operating expenses, including payroll, the administrative expenses, and reorganization related

expenses were not funded.  See id. ¶ 60.

56. The requested relief is necessary for Debtor to preserve the going-concern value of its assets and to minimize the disruption of Debtor's efforts to reorganize its business in an orderly fashion. Debtor's post-Petition Date revenue is insufficient to fund its operational expenses, administrative costs, and a reorganization of its business, and a DIP Loan is its only source of funding to preserve and protect its assets for an orderly and efficient reorganization.  Debtor will suffer immediate and irreparable harm unless it is immediately authorized to obtain financing in the amount and on the terms and conditions set forth in the Interim Order and the DIP Loan Agreement.  Debtor believes that the terms and conditions of the DIP Loan Documents, the Interim Order, and Final Order and the related relief requested herein are fair, reasonable, and in the best interests of Debtor, its creditors, and its estate.  See id. ¶ 61.

## VI.
## LEGAL AUTHORITIES

**A.**     **Approval Under Section 364 of the Bankruptcy Code.**

1.     Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security.  Debtor has been unable to obtain, nor does it believe it would be unable to obtain, financing in the form of unsecured credit, allowable under Section 364(b) of the Bankruptcy Code as an administrative expense.  Debtor is unable to obtain unsecured credit out of the ordinary course of business or credit with specialized priority or with security. The only party willing to lend funds to Debtor is Lender, which has agreed to provide a DIP loan to Debtor on the terms stated herein.  Thus, Debtor proposes to obtain financing under the DIP Loan Documents, the Interim Order, and the Final Order pursuant to Sections 105 and 364(c) of the Bankruptcy Code. See id. ¶ 62.

2.      Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in Sections 503(b) or 507(b) of the Bankruptcy Code or (b) secured by a lien on property of the estate that is not otherwise subject to a lien. "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986)); see also Suntrust Bank v. Den-Mark Const., Inc., 406 B.R. 683, 691 (E.D.N.C. 2009) (debtor need only make a reasonable effort to obtain post-petition financing under Section 364(c)).

**B.    Debtor Does Not Have an Alternative to the DIP Loan.**

3.      The DIP Credit Facility is needed in this Chapter 11 Case and Debtor has been unable to locate another lender willing to lend on terms better than or similar to those offered by the Lender, nor does Debtor believe that any there is any lender willing to lend on terms better than or similar to those offered by the Lender (especially not before Debtor's limited resources are depleted by such a search). The Lender is uniquely positioned and motivated to assist Debtor in its reorganization efforts. Lender is already, of course, familiar with Debtor's business operations, corporate structure, financing arrangements, and assets, and has already performed any due diligence necessary in connection with the DIP Credit Facility. The proposed DIP Credit Facility is the only financing available to Debtor. Debtor exercised its best business judgment in negotiating the DIP Loan Agreement and the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing. See id. ¶ 63.

**D.    Application of the Business Judgment Standard.**

4.      As described above, Debtor has concluded that the DIP Credit Facility provides the only reasonable alternative available under the circumstances. Bankruptcy

courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).   "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

5.     In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. See In re Wilson, 94 B.R. 886, 889 (Bankr. E.D.Va. 1989); In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).   Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted); see also Wilson, 94 B.R. at 889.   Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., Ames, 115 B.R. at 40 ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in-interest."); see also In re Yellowstone Mountain Club, LLC, 2008 WL 5869859 (Bankr.

D. Montana, November 26, 2008) (acknowledging the use of the business judgment standard with respect to approval of Section 364 financing).

6.      Approval of the DIP Credit Facility will provide Debtor with immediate and ongoing access to funds to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business.  Unless Debtor has access to such additional funds, the going concern value of Debtor's business will be diminished, and Debtor's ability to maximize value and reorganize will be jeopardized.  The funds provided under the DIP Credit Facility will enable Debtor to pay operating expenses and fund the reorganization of its business.

7.      Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Loan Documents.  Accordingly, Debtor should be granted authority to borrow funds from the Lender described above, pursuant to Sections 364(c) of the Bankruptcy Code, and take the other actions contemplated herein.  See id. ¶ 64.

8.      Debtor exercised its best business judgment in negotiating the DIP Loan Agreement and the Interim Order that is presently before the Court and the proposed Final Order to be submitted at the final hearing.  See id. ¶ 65.

**C.      Good Faith.**

9.      Section 364(e) of the Bankruptcy Code was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction."  In re EDC Holding Co., 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of Section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge"); see also In re North Atlantic Millwork Corp., 155 B.R. 271, 279 (Bankr. D.

Mass. 1993) ("The purpose of section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities."); In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985).

10.    The proposed DIP Credit Facility is and will be the result of good faith negotiations, with all parties represented by counsel.  Debtor believes that the terms of the DIP Loan are fair and reasonable under the circumstances, and that the Lender is in good faith and is entitled to the benefits of Section 364(e) of the Bankruptcy Code. See id. ¶ 66.

**D.    Modification of the Automatic Stay.**

11.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Lender to exercise, in compliance with the terms of the DIP Loan Agreement, all rights and remedies under such DIP Loan Agreement. Specifically, in the Event of Default, Lender may seek a hearing for relief of the automatic stay set forth in Section 362 of the Bankruptcy Code upon three days' notice to the Bankruptcy Administrator, the Top 20 Unsecured Creditors or, if a Committee has been appointed, to the Committee, and any other party filing a request for notice in the Chapter 11 Case

12. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in Debtor's business judgment, are reasonable and fair under the present circumstances.

**E.    Interim Approval of the DIP Loan.**

13.    Bankruptcy Rules 4001(c)(2) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on obtaining credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

14.    Pursuant to Bankruptcy Rule 4001(c), Debtor requests that the Court

conduct an expedited interim hearing to consider entry of the Interim Order authorizing Debtor to borrow an amount sufficient to fund its operating expenses pending a final hearing on the DIP Credit Facility and request to use Cash Collateral.

15.    No prior request for the relief sought herein has been made to this or any other Court.

## VII.
## NOTICE,  REQUEST FOR WAIVER OF THE STAY, AND REQUEST FOR FINAL HEARING

16.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  In view of the urgency of the relief requested herein and the risk to Debtor's operations if immediate relief with authority to fund the amounts requested in the Interim Order, Debtor will not be able to fund operations through the expiration of the 14-day period.  Accordingly, Debtor requests that this Court waive the stay under Bankruptcy Rule 6004(h) and provide in the order granting the relief sought herein that such order shall be effective immediately.

17.    Debtor shall serve notice of this Motion on the following: (i) the Office of the Bankruptcy Administrator for the Middle District of North Carolina; (ii) the holders of the twenty (20) largest unsecured claims against Debtor, or any official committee of unsecured creditors, if one is appointed pursuant to Section 1102 of the Bankruptcy Code; and (iii) any other committee that is appointed pursuant to Section 1102 of the Bankruptcy Code.

18.    Given the emergency nature of the relief requested herein, and the potential disruption to Debtor's business that will ensue if such relief requested is not granted, Debtor submits that no further notice need be given prior to granting the relief sought herein.

19.    Pursuant to Bankruptcy Rules 4001(c)(2), Debtor also respectfully

requests that the Court schedule the final hearing on this Motion.  Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to Debtor's estate.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

## VIII.
## <u>CONCLUSION</u>

Based on the foregoing, Debtor respectfully requests the Motion be approved as follows:

a.       Entering an order substantially in the form of the proposed Interim Order attached hereto as **Exhibit "1";**

b.       After a final hearing, entering a Final Order approving the relief requested herein, substantially in the form that shall be filed with the Court;

c.       Waiving the fourteen-day stay applicable to any order approving the use of estate property imposed by Bankruptcy Rules 6004(h); and

d.       Granting such other and further relief as is just.

Dated this 19th day of July, 2017.

BELL, DAVIS & PITT, PA

By: _____
WALTER PITT, ESQ.
NC Bar No. 3467
DANIEL C. BRUTON, ESQ.
NC Bar No. 22440
PO Box 21029
Winston-Salem, NC 27120-1029
Telephone 336-714-4110

-and-

GARMAN TURNER GORDON LLP
GERALD M. GORDON, ESQ.
NV Bar No. 229
(pro hac pending)
TERESA M. PILATOWICZ, ESQ.
NV Bar No. 9605
(pro hac pending)
650 White Drive, Ste. 100
Las Vegas, Nevada 89119
Telephone 725-777-3000

[Proposed] Attorneys for Debtor