UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | Bankruptcy Case No, 17-10814 |
| DYNAMIC INTERNATIONAL AIRWAYS, ) | |
| LLC, ) | Chapter 11 |
| ) | |
| Debtor. ) | |

## OBJECTION TO MOTION TO INCUR DEBT

Creditor PMC Aviation 2012-1 LLC ("PMC"), through counsel, submits this objection to Debtor Dynamic Internal Airways, LLC's (the "Debtor's") Emergency Motion Seeking Interim and Final Orders: (1) Authorizing Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Superpriority Administrative Expense, and (3) Setting and Prescribing the Form and Manner of Notice for a Final Hearing [Doc. No. 16] (the "Motion to Incur Debt").

## SUMMARY OF THE MATTER BEFORE THE COURT

The Debtor seeks to incur $6 million of superpriority debt to benefit one, and only one, person: its owner and financier, Kenneth Woolley ("Woolley"). The Debtor currently has significant assets such that, in a liquidation today, the non-insider general unsecured creditors would obtain a sizeable distribution, and might even be made whole. The Debtor, however, seeks to incur $6 million of debt (which when netted against the proposed payments to Woolley's companies is only $2.8 million of new cash), granting a superpriority lien in favor of Woolley, to fund operations that are projected to result in $6 million of losses. The proposed financing will not turn the corner for the Debtor. Suffering millions of dollars of continuing losses is not uncommon for this Debtor. According to its financial statements provided to the Department of Transportation of the United States (the "DOT"), the Debtor lost millions of dollars in every year of its operations

1

since 2010. In its ***best*** (or least-worst) year, the Debtor lost over $3 million. The Debtor's history shows that reorganization to profitability is exceedingly unlikely. Simply stated, the Debtor is not a financially viable company.

Additionally, the proposed use of the funds will only benefit Woolley to the detriment of the Estate and the unsecured creditors. The proposed budget will pay approximately $3.2 million of any advanced funds back to Woolley in the form of lease payments to Woolley's companies, even though the Debtor had not paid any lease payments to Woolley's companies in approximately a year and half. Meanwhile, PMC gets nothing on its judgment for lease payments. In effect, the Debtor is seeking to hand Woolley $6 million that would otherwise be available to the non-insider, unsecured creditors, including PMC, in exchange for $2.8 million in advances. This is incredibly unfair, and the Motion to Incur Debt should be denied.

PMC is also troubled by the Debtor's representations in this Case that Woolley has previously "loaned" the Debtor $12.1 million, with $6 million of the alleged debt secured by all of the Debtor's assets. This is directly contrary to the representations that the Debtor made to the DOT in the Debtor's efforts to obtain a valid certificate for "Scheduled Services," which the Debtor claims it desperately needs to reorganize. Before the DOT, the Debtor represented that all $45 million of Woolley's investments came in the form of capital contributions. Woolley also pledged that he would "invest" approximately $19 million as additional working capital while trying to have the Debtor deemed financially fit for the proposed Scheduled Services. Of course, these representations to the DOT are directly contrary to the representations the Debtor is making before this Court. Now, the Debtor claims that Woolley loaned money to the Debtor on a secured basis, and that he will not provide any further financial support absent a superpriority lien. Considering the clear fraud on either this Court or the DOT, PMC contends that Woolley's claimed loans to the

2

Debtor should be avoided as preferential or fraudulent transfers and/or recharacterized, or subordinated, netting even more returns to the unsecured creditors. As a further benefit to Woolley, however, the Motion to Incur Debt seeks to hamstring of the unsecured creditors committee with an unreasonably small cap on professional fees for the stakes involved in this Case.

According to the Debtor, this lopsided deal is necessary because it will eventually obtain approval from the DOT to provide Scheduled Services. The Debtor's prospects on this front are remote. The DOT has not approved the Debtor for such services in over three years because the agency has not been able to determine if the Debtor is fit and able to provide such services. In fact, the DOT issued an order in January 2017 scolding the Debtor for failing to provide the necessary information, financial and otherwise, to obtain the approval. It appears that the Debtor did not respond to the DOT's order, probably sounding the death knell to its alleged hopes. Regardless, the Debtor cannot reasonably expect that the DOT will reverse course if it belatedly responds to the DOT's order, arguing that it is financially fit despite the Chapter 11 filing and the bleak outlook it paints before this Court. Compounding the Debtor's problems, the failure to respond to the DOT's order has also placed its largest asset and continued viability in jeopardy, namely its certificates and DOT authorization to provide "Charter Services."

In short, the Debtor has not provided any legitimate business justification to give its assets to Woolley. The Motion to Incur Debt should be denied, and the Debtor should be swiftly liquidated for the benefit of PMC and the other non-insider, unsecured creditors.

PMC does not make this objection, or its contemporaneously filed motion to immediately convert to Chapter 7, lightly. It recognizes that the Debtor cannot survive without Woolley's financial support to cover its incredible losses. Woolley, however, has a choice. He can keep the Debtor afloat in the faint hope that the Debtor's financial predicament changes for the better by

living up to his pledge to the DOT and investing the needed operating capital. Otherwise, and unfortunately, the Debtor is out of options.

## FACTUAL BACKGROUND

### I. THE DEBTOR'S ABUSE OF PMC AND THE LITIGATION BETWEEN THE PARTIES

1. PMC is a limited liability company formed by three members, including Amur Finance IV LLC ("Amur") and Jet Midwest Group LLC ("Jet Midwest") for the purpose of purchasing aircraft and then leasing the aircraft or selling off the component parts. Amur is in the business of aircraft finance and leasing. Jet Midwest is in the business of owning, leasing and selling aircraft and component parts.

2. The Debtor's CEO, Paul Kraus ("Kraus") is and has been the CEO of the Debtor and Jet Midwest at all relevant times. Jet Midwest was the original managing member and servicer for PMC.

3. On or about January 1, 2014, PMC and the Debtor entered into an agreement (the "Lease Agreement") whereby PMC leased a Boeing 767 aircraft, Registration Mark N770JM and related engines (collectively the "Aircraft") to the Debtor. The Debtor took possession of the Aircraft in January 2014 and used it to provide charter airline services.

4. Kraus, through his control of Jet Midwest (the managing member of PMC at the time) abused his authority in order to support the Debtor's operations, always to the detriment of PMC. Of particular note, the Debtor *never* made a single lease payment to PMC in almost two years. Kraus never once caused PMC to demand payment. Kraus also caused PMC to deliver almost $1 million in aircraft parts to the Debtor for which the Debtor never paid.

5. Amur took over PMC's operations when it realized the extent of Kraus's mismanagement, including that the Debtor, also under Kraus's control, never intended to pay its lease obligations for the Aircraft.

6. On or about October 26, 2015, with the Debtor's past-due accrued amounts well over one million and rising, PMC delivered a Notice of Cancellation and Demand to the Debtor cancelling the Lease and instructing the Debtor to return the Aircraft to PMC.

7. The Debtor ignored the cancellation notice and its contractual obligation to return the Aircraft, instead continuing to operate the Aircraft in Asia for profit.

8. In response to repeated demands to return the Aircraft, Kraus, on behalf of the Debtor, threatened that the Debtor would never return the same. Consequently, PMC commenced the case captioned *PMC Aviation 2012-1 LLC v. Dynamic International Airways, LLC*, Case No. CL15-2512, Circuit Court of Rockingham County Virginia (the "State Court Action").

9. Ultimately, the Debtor returned the Aircraft to PMC, and on June 26, 2017, PMC obtained a judgment against the Debtor in the principal amount of $1,190,807.24 (the "Judgment"). A true and correct copy of the Judgment is attached hereto as Exhibit 1.

10. On July 18, 2017, PMC requested writs to garnish on any of the Debtor's accounts at Wells Fargo Bank, NA, Bank of America, NA, and PNC Bank, NA (the "Banks"). The writs were issued and served on the Banks on July 18, 2017. Apparently, in response to the orders contained in the writs, the Bank's froze the Debtor's accounts. The Debtor then filed its Chapter 11 Petition on July 19, 2017.

## II. THE DEBTOR'S REPRESENTATIONS AND MISREPRESENTATIONS TO THE UNITED STATES DEPARTMENT OF TRANSPORTATION AND THE UNLIKELIHOOD OF THAT THE DEBTOR WILL EVER OBTAIN A RIGHT TO ENGAGE IN SCHEDULED SERVICES.

11. As the Debtor states repeatedly in its First Day Motions, the Debtor operates under a number of Certificates issued by the DOT. A true and correct copy of the Certificates, as reissued by the DOT on February 4, 2016, are attached hereto as Exhibit 2.

12. To obtain each of the Certificates, the Debtor was required to show the DOT that it was financially fit to provide the air services offered. This is a continuing duty, and the DOT has authority to suspend all of the Debtor's operations if it deems the Debtor as unfit.

13. The effectiveness of the Certificates for Scheduled Services has been "indefinitely stayed" by various orders of the DOT until the Debtor fulfills certain conditions. Of particular importance to the Motion to Incur Debt, the Debtor must show the DOT that it has "funds sufficient to . . . provide a working capital reserve equal to the operating costs that would be incurred in three months of operations."

14. Dynamic has made significant misrepresentations in its efforts to get the DOT to lift the stay on the Scheduled Services. First, on December 5, 2014, Debtor submitted various financial statements to the DOT. A true and correct copy of the December 5, 2014 submission is attached hereto as Exhibit 3. Exhibit 6 contains the Debtor's financial statements as prepared by Jonas Aquino, who purported to be an "independent third-party." Mr. Aquino, however, is not independent. In fact, as shown on his Linkedin profile attached hereto as Exhibit 4, Mr. Aquino has been the controller of Kraus's company, *Jet Midwest*, since June 2012.

15. Even if the Debtor's false claim that Mr. Aquino is independent could be set aside, the financial statements show that the Debtor has always incurred extraordinary losses from its

6

charter operations. The Debtor lost over $3.7 million in 2013, over $10.4 million in 2011, and over $5.1 million in 2010.[1]

16. On August 10, 2016, the Debtor submitted a further response to the DOT in its effort to obtain the approval for Scheduled Services (the "August 10 Response"). A true and correct copy of the August 10 Response is attached hereto as Exhibit 5.

17. To satisfy the DOT's working capital requirement, Woolley pledged to the DOT that he would personally fund the entire working capital requirement. Specifically, Woolley pledged that he "would personally loan *or invest* through various entities . . . $19.3 million to guarantee [the Debtor's] ability to meet the three-month financial fitness test." (emphasis added)

18. On January 3, 2017, the DOT issued an order staying the effectiveness of the Certificates for Scheduled Services indefinitely. A true and correct copy of this "Indefinite Stay Order" is attached hereto as Exhibit 6.

19. In the Indefinite Stay Order, the DOT scolded the Debtor, stating that "the requirement that air carriers be 'fit' to perform air transportation services is a continuing one and that an air carrier's authority shall be modified, suspended, or revoked if it either fails to remain fit or fails to file such reports as we deem necessary to determine whether it remains fit."

20. The DOT went on, "[m]ore than four months has elapsed since the Department initially requested information from [the Debtor] necessary to conduct a continuing fitness review of the air carrier, and yet [the] the Debtor has failed to provide us with sufficient information to determine whether it continues to be fit to conduct proposed operations."

---

[1] The profit and loss statements for the various years have conflicting dates. 2012 data appears to have been omitted. In any event, the Debtors has shown that it has no ability to turn a profit on charter services alone.

21. The DOT then noted that it may take action against the Debtor's Certificates for Charter Services (the Debtor's current lifeblood, if it has any): "Moreover, the information requested also relates to [the Debtor's] fitness to conduct its existing interstate and foreign charter operations, [the Debtor's] responsiveness to our information request is imperative if we are to carry out our responsibilities."

22. The DOT then ordered the Debtor to provide twelve categories of information within fourteen days.

23. In particular, the DOT demanded: (1) a current (within 3 months) balance sheet and income statement; (2) a revised forecast income statement (broken down by quarters with specific details requested by the DOT) and a revised forecast balance sheet for the first year ending after the initially proposed scheduled operations are normalized; (3) an explanation regarding the Debtor's "apparent failure to comply with the reporting condition the Department imposed on the carrier;" and (4) other information peculiar to the airline industry.

24. Incredibly, to the best that PMC can determine from its review of the relevant DOT dockets, the Debtor ***never responded*** to the Indefinite Stay Order.

25. Instead of responding to the Indefinite Stay Order, the Debtor supplemented some of its earlier submissions to the DOT. The Debtor's last submission to the DOT that PMC was able to find is dated January 13, 2017. A true and correct copy of the January 13, 2017 submission is attached hereto as Exhibit 7. The submission shows the Debtor lost over $2.2 million between January 1, 2016 and October 31, 2016.

26. PMC is skeptical of the representations made by the Debtor in the balance sheet it provided to the DOT in the January 13, 2017 submission. In particular, the Debtor represented to the DOT that it was highly solvent, with over $7 million more in assets than liabilities. This is

directly contrary to the representations made to this Court that the Debtor's liabilities greatly exceed its assets (which will be addressed in further detail below).

27. The January 13, 2017 submission does not contain a forecast balance sheet for the first year ending after the initially proposed scheduled operations are normalized.

28. While the Debtor's January 13, 2017 submission does include a projected income statement, the projection is not broken down by quarter as required by the Indefinite Stay Order. Furthermore, the projected income statement does not include all of the particularized information required by the Indefinite Stay Order. Specifically, the projection does not "distinguish the direct and indirect expenses associated with the [the Debtor's] proposed scheduled and current charter operations."

29. In any event, the statement projects a cumulative *loss* for 2017 of **$7,369,000**.

30. In short, the financial statements the Debtor has submitted to the DOT in order to show its financial "fitness" prove that the Debtor cannot stabilize its operations. The Debtor has lost millions of dollars every year. The Debtor has provided no particularized explanation to either the DOT or this Court as to how it plans to stem the tide.

31. In addition, the Debtor's apparent failure to respond to the Indefinite Stay Order is inexcusable. This failure makes it very unlikely that the stay on the effectiveness of the Certificates for the Scheduled Services will ever be lifted. Perhaps more importantly in the context of this Case, the Debtor's failure to respond to the DOT's explicit demands has jeopardized its most valuable asset in this case—namely, its Certificates for Charter Services.

### III. WOOLEY'S PURPORTED SECURED LOANS ARE AVOIDABLE, IF HE EVER MADE SUCH LOANS TO THE DEBTOR

32. In the First Day Motions, the Debtor repeatedly represented that Woolley loaned the Debtor $12.1 million with $6 million of the same secured by a perfected security interest as

9

evidenced by a UCC-1 financing statement filed in Virginia in August 2016. The Debtor also states that Woolley has contributed approximately $35 million in capital contributions to fund the Debtor's operations.

33. The Debtor's representations to this Court are directly contrary to the October 31, 2016 balance sheet included in its January 13 submission to the DOT. According to the balance sheet, Wooley has made no loans to the Debtor, secured or otherwise. Instead, the Debtor reported to the DOT that Woolley contributed over $42 million as equity into the Debtor (likely more as there is a line item for unaffiliated paid in capital of over $28 million).

34. The Debtor's representations to this Court concerning Woolley's capital / loans and the Debtor's representations to the DOT cannot both be true. Considering the terse nature of the Indefinite Stay Order, all of the Debtor's Certificates are likely to be suspended if the Debtor misrepresented its financial condition to the DOT.

35. On the other hand, if the Debtor misrepresented the facts to this Court (as PMC believes) in an effort to stack the deck in Woolley's favor on the Motion to Incur Debt, serious sanctions should be meted out.

36. Additionally, Woolley's purported pre-petition security interest, if any, should be set aside as (i) a preference to an insider under Code § 547 (if the Debtor is insolvent as alleged in its Petition) or (ii) a fraudulent transfer under Code § 548 (to the extent that the Debtor is solvent as represented to the DOT). Woolley's purported loans and security interest, if any, should also be equitably recharacterized as equity or equitably subordinated to the claims of the non-insider, unsecured creditors under Code §§ 105, 510, and 726. *See Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors*, 453 F.3d 225, 231 (4th Cir. 2006).

## IV. THE PROPOSED POST-PETITION FINANCING IS UNFAIR TO THE ESTATE AND THE UNSECURED CREDITORS

37. Against the backdrop of indefinite continuing losses, material misrepresentations to the DOT and/or this Court, and the Debtor's utter failure to submit requested information to the DOT necessary to continue with its operations (let alone expand into the Scheduled Services), the Debtor has proposed post-petition financing that will strip the unsecured creditors, including PMC, of any meaningful distribution. This should not be permitted.

38. In its Petition, the Debtor represents that it has at least $10 million in assets. If its balance sheet provided to the DOT is to be believed, the Debtor has over $25 million in assets. Plainly, if the Debtor were liquidated today, the unsecured creditors, including PMC, would receive a sizeable distribution. Once Woolley's loan claims are avoided, recharacterized, or subordinated, the non-insider creditors may come close to a complete recovery.

39. The Debtor, however, requests permission to take all of its assets to secure a $6,000,000 loan. The Debtor then proposes to use this money to fund operations for six months. The Debtor projects that, during this six month period of additional operations, it will incur $6 million in additional losses.

40. Furthermore, the Debtor proposes to use approximately $3.2 million of the funds advanced by Woolley to fund airplane lease payments to Woolley's companies. As the Debtor represented in its First Day Motions (and its balance sheet presented to the DOT), it has made no airplane lease payments to Woolley in an extended period of time. Based on the monthly lease obligations to Woolley's companies, PMC estimates that the Debtor did not make lease payments to Woolley's companies for the previous year and a half.

41. In addition, the Debtor proposes to impose a $15,000 cap on the fees incurred by the Unsecured Creditors Committee while significantly restricting the types of investigations permitted by the committee. These provisions benefit one, and only one, person: Woolley.

42. In sum, the proposed financing would take $6 million from the unsecured creditors through a superpriority lien and hand the same over to Woolley. At the same time, the proposed financing would significantly impairing the non-insider, unsecured creditors' ability to organize into a committee to challenge Woolley's claims in this Case. In exchange, Woolley proposes to advance $2.8 million of additional capital to the Debtor (net of the budgeted lease payments to Woolley's companies). This is incredibly unfair, especially considering the lack of any real chance for the Debtor to ever recognize a profit, and PMC respectfully requests that the Motion to Incur Debt be denied.

## ARGUMENT

A debtor seeking superpriority post-petition financing under Code § 364(c) faces a difficult burden. While the Debtor is not required to seek unsecured debt from every possible source, the Debtor generally must show that "(1) the debtor cannot obtain credit unencumbered or without superpriority status under section 364(b), (2) the credit transactions are necessary to preserve assets of the estate and (3) the terms of the transactions are fair, reasonable and adequate, given the circumstances of the debtor in possession-borrower and the proposed lender." 3-364 COLLIER ON BANKRUPTCY ¶ 364.04 (16th 2017) (collecting cases). The proposed loan should not be approved if there is little prospect for reorganization and the risk of default under the loan's terms is unreasonably high. *See In re Tamarack Resort, LLC*, 2010 Bankr. LEXIS 3680, *51 (Bankr. D. Idaho Oct. 19, 2010). A proposed loan cannot be approved if its terms "attached unacceptable express or implied conditions [so that the lender] might exert unacceptable control over the Trustee

[or debtor in possession] in the exercise of [its] fiduciary duties." *Modanlo v. Ahan (In re Modanlo)*, 2006 U.S. Dist. LEXIS 96455, *17 (D. Md. Aug. 16, 2006).

Most importantly, all insider "dealings with the corporation are subjected to ***rigorous scrutiny*** and where any of their contracts or engagements with the corporation is challenged the burden is on the [insider] not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Pepper v. Litton*, 308 U.S. 295, 306 (1939) (emphasis added).

It is further settled that "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor [or insider] rather than the estate." *In re AMES DEPT. STORES*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. May 15, 1990). That is exactly the case here. Woolly, an insider of the Debtor, is trying to secure all of the Debtor's substantial assets with a cash infusion of only $2.8 million (net of the payments that will come right back to Wooley in the form of lease payments) in a transparent effort to wipeout any recovery for non-insider, unsecured creditors, which are owed tens of millions of dollars.

Additionally, "the court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation [or in collusion with an insider], has compromised the rights of unsecured creditors." *In re FCX, Inc.*, 54 B.R. 833, 838, 1985 Bankr. LEXIS 4980, *9 (Bankr. E.D.N.C. Nov. 14, 1985). The proposed loan is not designed to protect assets of the estate. Rather, the Debtor projects that it will lose $6 million after it hands Woolley a superpriority security interest in all of its unencumbered assets. The Debtor has shown no realistic ability to operate without continuing, multi-million dollar losses, and the Debtor has ***no*** track record for paying any of its debts, ***ever***. Rather, the loan will mature no later than December 31, 2017. The Debtor has no prospect of paying the loan off at maturity. ***Default is guaranteed.*** This may be by design, so

that Woolley can foreclose on all the assets on January 1, 2017 and leave the non-insiders with nothing. The only party who would benefit from this proposal is Woolley. The Motion to Incur Debt should, therefore, be denied.

In addition to the general lack of fairness, there are numerous terms that should fail on their own:

- A $15,000 carve-out for professional fees incurred by the unsecured creditors committee is unreasonable. The Debtor claims that Woolley loaned $12.1 million dollars pre-petition. As explained above, the unsecured creditors will vigorously oppose any claim made by Woolley. This provision is designed to protect Woolley to the detriment of all non-insiders.

- The indemnification provision is too broad. The provision should make clear that the Debtor is not indemnifying Woolley, or any of his other businesses, in any proceeding challenging any of Woolley or his other businesses' claims in this case or any preference or avoidance action against Woolley or his other businesses.

- The Loan and Security Agreement references a Promissory Note. The Promissory Note has not been provided to the parties in interest for review.

- The Additional Negative Covenants require the Debtor to continue operating, even if the Debtor's fiduciary duties to the Estate and the non-insider, unsecured creditors require the Debtor to shutter operations (as is the present situation).

- The Additional Negative Covenants prevent the debtor from assuming or rejecting any executory contracts or unexpired leases. This is a tremendous benefit to Woolley because $3.2 million from the proposed budget will flow through to his companies for lease payments, regardless of the reasonableness of such leases.

Indeed, this provision practically prohibits any meaningful efforts to even attempt to reorganize.

- The "Bankruptcy Defaults" in Section 8.5 provide Woolley with near unfettered control of the Chapter 11 case.

- The limitations of liability in Section 10.5 are too broad. The provision should make clear that Woolley and his other companies that interact with the Debtor are not subject to such liability limitations to the extent that the asserted liability does not arise out of the proposed loan.

## **CONCLUSION**

In summary, the proposed loan serves no purpose other than to take assets that should be liquidated to provide a distribution to the non-insider, unsecured creditors and give those assets to Woolley. The Motion to Incur Debt should, therefore, be denied.

Respectfully submitted, this the 21st day of July, 2017.

/s/ Clint S. Morse

Clint S. Morse
N.C. State Bar No. 38384
*Attorney for PMC*

OF COUNSEL:
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina  27420
Telephone:  (336) 373-8850

## CERTIFICATE OF SERVICE

This is to certify that on this date, the foregoing document was served upon the following parties or counsel by electronic filing and/or depositing a copy in the United States mail, first class postage prepaid, addressed as follows:

Daniel C. Bruton via electronic service dbruton@belldavispitt.com

Erik T. Gjerdingen via electronic service egjerdingen@gtg.legal

Gerald M. Gordon via electronic service ggordon@gtg.legal

Theresa M. Pilatowicz via electronic service tpilatowicz@gtg.legal

Robert E. Price, Jr. via electronic service robert_e_price@ncmba.uscourts.gov

Dynamic International Airways, LLC
4310 Regency Drive
Suite 100
High Point, NC 27265

This the 21st day of July, 2017.

/s/ Clint S. Morse
Clint S. Morse